**STATE of Missouri, Respondent,**

v.

**Michelle E. DALE, Appellant.**

**No. WD 47141.**

Missouri Court of Appeals,
Western District.

Feb. 22, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 1994.

Application to Transfer Denied
May 26, 1994.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, C.J., P.J., and BRECKENRIDGE and SMART, JJ.

BERREY, Chief Judge.

Appellant appeals her jury conviction of assault in the first degree and armed criminal action and court sentence of ten years imprisonment on Count I and five years imprisonment on Count II to run consecutively. Michelle and James Dale were married in April, 1990. Michelle had a son, David Cole-

man, from a previous marriage and he lived with his mother and stepfather, James Dale.

Mrs. Dale was employed when she married James. She quit after their marriage to accept his offer to support her and to become a full time homemaker and mother. At the time of this marriage, James was an over-the-road truck driver often gone from home for extended periods. During one of these trips, eviction papers were served on Michelle and she and David moved in with James Dale's brother. Subsequently, they moved into a house James Dale owned and had rented to others.

On September 27, 1991, James Dale had been drinking and using "speed" and meth-amphetamines with a friend, Vernon Cobert. Appellant told James he would have to watch David the next day because she had to work. Dale was gone that night and returned at 6:00 p.m. the next evening. When he arrived home, David was playing with his gun collection. James became quite angry and verbally abusive to David. During this confrontation appellant returned home and observed James drag David through the house, screaming at him. James spit in David's face, repeatedly struck him on the head and screamed obscenities at him. David called for his mother to help him. James sent David to clean up the back yard and told appellant to keep David away from him. James said, "[d]on't let me see that kids face. I'm afraid of what I'll do to him." Friends called on the Dales and this family dispute subsided.

At approximately 9:00 p.m. the guests left and appellant told James the clutch on her truck was slipping. He went to repair the truck and found a saber saw in the tool box that belonged to his mother. His mother had reported the saw missing, and finding it, as he did, he believed appellant had stolen the saw from his mother. James went back to the house and confronted the appellant in their bedroom. Appellant was preparing to take a shower. He grabbed her by the throat and threw her against the sink. James shouted, "I'm going to show you what mad really is." Appellant tried to hit James. He told her to get dressed, get her son, and leave the house. At this juncture James left

the bedroom and the appellant sat down on the bed. She was going to use the phone and also try to determine where she should go. In the interim, James was downstairs visiting with a friend, David Bergen, and cleaning up his guns.

James then heard the shower turn on and he went back upstairs to tell appellant to leave. He found appellant seated on the bed snorting a line of speed. James testified that she pulled a gun on him and he tried to take it and she shot him six times.

Appellant testified that when James came back upstairs he threw her to the floor and threatened to kill her and told her to leave. As he left the room he told her he should, "beat you like a man." Appellant picked up the phone and James came back into the room with a pistol clipped to his overalls and screamed, "I'm going to kill you." As he started for appellant she grabbed a gun from the dresser and fired. She acknowledged that she shot him, but did not know how many times, at least twice in the back while he was prone on the floor. At the time of the shooting, David was in his own room and was not a witness to the incident.

Appellant alleges three points of trial court error: (I) that the trial court erred by failing to submit Instruction C patterned after MAI–CR3d 306.08, regarding the law on the defense of others; (II)(a) the trial court erred in allowing appellant's testimony to be impeached with purported prior inconsistent statements introduced through appellant's probation officers; (b) the testimony of the probation officers consisted of confidential and privileged information communicated by appellant; (c) the testimony concerning appellant's alleged enrollment in Longview Community College was collateral and irrelevant; and (III) trial court erred in submitting Instruction # 4 patterned after MAI–CR3d 302.04. Instruction C as submitted by appellant and raised in Point I is as follows:

## INSTRUCTION C

One of the issues in this case is whether the use of force by the defendant against James Dale was in defense of another person. In this state, the use of force (includ-

ing the use of deadly force) to protect another person from harm is lawful in certain situations.

In order for a person lawfully to use force in defense of another person, such a defender must reasonably believe the person she is trying to protect is in imminent danger of harm from a third person. The person she is trying to protect need not be in actual danger but the defender must have a reasonable belief that the person is in such danger.

If the person trying to protect another person has such a belief, she is then permitted to use that amount of force which she reasonably believes to be necessary to protect the other person.

But a person acting in the defense of another person is not permitted to use deadly force, that is, force which she knows will create a substantial risk of causing death or serious physical injury, unless she reasonably believes the person she is trying to protect is in imminent danger of death or serious physical injury.

And, even then, a person may use deadly force only if she reasonably believes the use of such force is necessary to protect the other person.

As used in this instruction, the term "reasonable belief" means a belief based on reasonable grounds, that is, grounds which could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of the defense of another person in this case, you are instructed as follows:

If the defendant reasonably believed David L. Coleman was in imminent danger of death or serious physical injury from the acts of James Dale and she reasonably believed that the use of deadly force was necessary to defend David L. Coleman, then she acted in lawful defense of another person.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful defense of another person. Unless you find beyond a rea-

sonable doubt that the defendant did not act in lawful defense of another person, you must find the defendant not guilty.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

The trial court denied appellant's request to submit this instruction to the jury. Section 563.031.1 RSMo, 1986, pertains to use of force in defense of persons and reads as follows:

1. A person may, subject to the provision of subsection 2, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful force by such other person, ....

■ According to *State v. Taylor,* 770 S.W.2d 531, 533 (Mo.App.1989) deadly force may be used defending another or in self defense only when there is

....(1) an absence of aggression or provocation on the part of the defender [or the one being defended], (2) a real or apparently real necessity for the defender to kill in order to save himself [or the person defended] from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and need to take a life. *State v. Chambers,* 671 S.W.2d 781 (Mo. banc 1984) [1–3].

The actor may not use more force than he reasonably believes necessary to prevent harm to the defended person and the force may not exceed that which the defended person would be justified in using. *State v. O'Neal,* 639 S.W.2d 393, 395–96 (Mo.App. 1982) and *State v. Grier,* 609 S.W.2d 201, 204 (Mo.App.1980).

■ The appellant offered no direct or specific evidence that her son David was in

imminent danger of death or serious physical injury.

The following testimony was elicited from the appellant:

Q. Did he tell you to leave his house?

A. Yes, he did tell me to leave his house. He told me to put my clothes on, get my son out of that bed and get out on the streets.

Q. What did you say in response to that?

A. I said I couldn't leave. I had nowhere to go.

Q. Did he turn around and leave the room?

A. Yes.

Q. And what did you do?

A. I went over and sat on the side of the bed and put a shirt on, trying to figure out what was going on. I really—I was scared. I didn't know what he was going to do.

Q. And what did you do after you sat on the side of the bed?

A. I decided—you know, I didn't know what he was going to do. I decided I was going to take a shower. I went back in the bathroom. I was standing in there. I hadn't turned the water on, I hadn't taken the shirt off. He came back into the bedroom. I turned around.

He grabbed me this time and forced me down on the floor, had his knee in my chest, told me that he was going to kill me, to get my shit and get out of the house, get my son out of that house. He was going to show me what mad really was. And he said, "I ought to beat you like a man," and then he left again.

This time he terrified me. I didn't know what he was going to do. I went ahead and put my clothes on. I went over to the side of the bed and sat down again.

Q. What side of the bed are we talking about?

A. On the far side of the bed away from the door.

Q. Okay.

A. That's where the telephone was. I was trying to figure out who I could call to come and get me because I didn't know

what he was going to do. That's when he came back in the bedroom. This time I thought I had locked the door. I'd closed the door. I thought I had locked the bedroom door.

All of a sudden I heard the door burst open and Jim came in, and he had the gun clipped to the side of the bib overalls. He said, "I'm going to kill you. Get the fuck out of my house. I'm going to kill you."

He started toward me.

Q. Did he say anything about your son?

A. He said he was going to hurt my son and take—jerk him out of the bed, throw him out on the street, hurt him seriously. He came at me, came—started around the side of that bed. All I saw was his hand drop down. I thought he was going to shoot me.

At that point I grabbed the gun and shot.

. . . .

Q. Did you hit anything?

A. I'm not sure if I hit anything. It was—it happened so fast, I'm not sure what happened. But all I know is Jim kept coming at me. And I just told him to, "Please, leave me alone. Quit. Don't hurt me anymore." And I shot him. That's all I remember.

Appellant also was permitted to submit an instruction of self-defense to the jury. The jury's verdict of guilt rejected the claim of self-defense.

The evidence suggests that only a dispute between James and appellant existed. The evidence does not show that at the moment of the shooting she reasonably believed her son David was in immediate danger. The trial court did not err in refusing appellant's request to submit Instruction C.

Point I is denied.

Point II alleges the trial court erred in permitting the rebuttal testimony of appellant's probation officers.

Two incidents occurred between the victim and the appellant that pre-date the shooting. The appellant has attempted to boot strap her claim of self-defense, a claim the jury rejected, to those incidents.

The first incident occurred in May of 1991, some four months before appellant shot Mr. Dale. Appellant testified that Mr. Dale threatened to kill her, then discharged a pistol next to her cheek from which she received powder burns and sustained temporary hearing loss. Mr. Dale admitted the incident occurred.

The second incident occurred sometime in mid to late August, 1991. Appellant testified that Mr. Dale came home at four in the morning extremely intoxicated. He walked into the bedroom, grabbed her by the throat, threw her down on the bed and began strangling her, and accused her of having gone out with another man. Appellant testified Mr. Dale let her go and they had a "huge" argument. Appellant claims her vocal chords were damaged in the incident. Mr. Dale was not asked about the second incident in his testimony.

The state offered testimony from Diana Goodman and Patrick Hodges, probation officers who supervised appellant while she was on parole for an unrelated offense. Their testimony was objected to by the defense based upon the privileged communications as provided by § 559.125 RSMo Supp.1990. In addition, the state offered exhibit 55, the transcript of appellant's probation violation hearing on January 17, 1992. Exhibit 55 was received over appellant's objection.

Officer Hodges testified he was appellant's probation officer from February 4, 1991 to August 12, 1991. Hodges said, "when a person's first placed on probation we ask some questions. We call it an assessment form. One of those questions pertains to abuse the probationer may have suffered." The question on the form was, "[d]o you feel you've ever been abused?" Appellant's counsel objected to this line of questioning, "for the same reasons that I stated earlier." The court again overruled the objection and stated, "[w]e're not talking about attorney/client privilege. We're talking about attacking credibility. The defendant having testified subjects the defendant to attack on her credibility." The objection was overruled and Hodges responded, "[s]he told me that her first husband physically abused her, and she

gave me a date of 1978. And her husband's—ex-husband's name was Louis Dolen. And that's the only person that she gave me as abusing her." Although this evidence was apparently offered on the issue of credibility, it did not serve to impeach Ms. Dale's credibility as to the May, 1991, incident of abuse since Mr. Dale acknowledged that abuse took place. Also, it did not impeach her credibility as to the second incident because the second incident was alleged to have occurred *after* the time Hodges had the discussion with her concerning abuse.

Officer Goodman became appellant's probation officer on August 23, 1991. Ms. Goodman testified:

She came up to my office about the first week of September, '91. And I was still at that point getting to know people and my caseload, so we talked. And at that time she told me she had been thrown out of her husband's home and they were separated.

And I asked her if there was any chance of reconciliation in the relationship. She said she didn't know, and she hoped so.

And I asked her for her sake if she had had any type of abuse, if he had gotten physical with her at anytime, and she said no.

This testimony conflicted with her testimony as to the alleged violence rendered by Mr. Dale in August, 1991, essentially the same testimony was received, over objection, with the admission of state's exhibit 55. Exhibit 55 is the transcript of appellant's probation violation hearing on January 17, 1992. The trial transcript reveals that at the probation hearing, Ms. Goodman testified she asked appellant, "[h]as he ever abused you?" and appellant said, "no."[1] The admission of exhibit 55 was objected to at trial, but its admission was not raised in appellant's motion for judgment of acquittal or, in the alternative, for a new trial. The admission of exhibit 55 was not raised on appeal. Appellate review is limited to the issues raised in appellant's points relied on and they alone

1. Exhibit 55 was not provided to this court.

need be considered. *In re Marriage of Caby*, 825 S.W.2d 56, 61 (Mo.App.1992).

■ Appellant claims it was improper to allow her testimony to be impeached with prior inconsistent statements introduced through her probation officers, because such statements were not inconsistent and no proper foundation was laid to impeach her testimony. Appellant also maintains that the testimony of the probation officers consisted of privileged communications as provided by § 559.125 RSMo Supp.1990.

Impeachment is directed to a witness' credibility and ordinarily furnishes no additional factual evidence. *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 661 (Mo.App.1991). Contradiction is directed to the accuracy of a witness' testimony and supplies additional factual evidence. *Id.* A foundation is not necessary for the State to offer, in rebuttal, testimony contradictory of statements made by the defendant in her testimony. *State v. McQuerry*, 406 S.W.2d 624, 628 (Mo.1966).

■ The testimony of officer Goodman not only contradicted appellant's testimony that James Dale physically abused her, but also was relevant to the issue of self-defense. No foundation was necessary for the State to offer this testimony.

Appellant contends that the testimony of the probation officers was inadmissible because it consisted of privileged communications as provided by § 559.125 RSMo Supp. 1990.[2] It states, in part, "[i]formation and data obtained by a probation or parole officer shall be privileged information and shall not be receivable in any court."

■ The mere detection of an erroneous ruling on the admission or exclusion of evidence does not end appellate review. *State v. Henderson*, 700 S.W.2d 105, 108 (Mo.App. 1985). We must determine whether the error was such as to warrant reversal. *Id.* Error committed in a criminal case is presumed prejudicial, but that presumption is not conclusive and may rebutted by the facts and circumstances of the case. *State v.*

*Ford*, 639 S.W.2d 573, 575 (Mo.1982). We find that regardless of whether or not the probation officers' testimony was privileged, appellant was not unfairly prejudiced by their testimony. Further, the testimony of the probation officers was simply cumulative to the testimony offered by Ms. Goodman at the probation hearing January 17, 1992. Since no error was preserved with regard to the admission of that evidence, we find no error in the admission of this evidence. Thus, the evidence undermining the credibility of appellant's testimony of abuse was already in the case. No prejudice can be found from the admission of evidence which is merely cumulative. "It is not error to admit normally inadmissible evidence over objection when the evidence is cumulative." *State v. Ek*, 834 S.W.2d 828, 831 (Mo.App. 1992).

Appellant alleges two incidents of abuse prior to her shooting of Mr. Dale. The first occurred in May of 1991 when Mr. Dale threatened appellant and discharged a pistol next to her cheek. Mr. Dale admitted this incident occurred.

Probation officer Hodges was appellant's probation officer from February 4, 1991 to August 12, 1991. He testified that on February 8, 1991 as part of an "initial assessment" of appellant, he asked her whether she had ever been abused. Her first husband, Louis Dolen, was the only person she gave as abusing her. We cannot see how Mr. Hodges' testimony could have been prejudicial. Hodges asked appellant the question regarding abuse on February 8, 1991. The only incidents of abusive behavior appellant testified to occurred in May of 1991 and several weeks before appellant shot Mr. Dale on September 28, 1991. There is nothing inconsistent between appellant's testimony and Hodges' testimony. As already noted, appellant was not prejudiced by probation officer Hodges' testimony.

The second abusive incident occurred in mid to late August, 1991. Appellant testified that Mr. Dale came home intoxicated, began

---

**2.** Section 559.125 has never been interpreted by our courts. When construing a statute, our courts are "to give effect to the purpose of its enactment and the evident legislative intent." *AT & T v. Wallemann*, 827 S.W.2d 217, 223 (Mo.App.1992). "The legislature is deemed to have intended what the enactment states directly." *Id.*

strangling her, which temporarily caused her to lose her voice. Mr. Dale was not asked whether this second incident occurred. Probation Officer Goodman testified in the first week of September, she asked appellant, "if he [Mr. Dale] had been abusing her in any way, and she said no."

The second abusive incident, about which appellant testified, occurred before her discussion with Officer Goodman in the first week of September. Even if the jury understood it as a contradiction, we do not believe appellant was prejudiced by the admission of Officer Goodman's testimony.

The appellant also complains in Point II that the trial court erred in admitting the rebuttal testimony of May Beth Johnson, Longview Community College records custodian. Appellant alleges that the testimony of Ms. Johnson was collateral and irrelevant in the case against her. Ms. Johnson testified as to appellant's alleged application to attend Longview and her alleged entry into Longview's "Pace Program."

■ When a collateral issue is first raised by the defense on direct examination or is volunteered on cross-examination, it becomes a proper subject for rebuttal. *State v. Dunlap,* 706 S.W.2d 272, 275 (Mo.App.1986).

Direct examination raised the issue of appellant's alleged application to Longview Community College:

DEFENSE ATTORNEY MUNDAY—
Q: This Police Officer Ward said that you told him—when you asked him your occupation you said student?

APPELLANT—A: Yes.

    \*    \*    \*    \*    \*    \*

Q: And did you tell him you were a student?

A: Yes, I did.

Q: When you did, what were you referring to?

A: I was applying to go back to school at Longview Community College.

The above testimony made appellant's application status at Longview a proper subject for rebuttal.

Cross-examination, raised the issue of her alleged entry into Longview's "Pace Program." She testified:

Q: Were you enrolled then at [Longview]?[3]

A: I had turned in my forms for my student loan. I had entered their Pace Program, but I was not officially a student yet, no, but I was applying to be a student.

The above testimony made appellant's enrollment status in Longview's "Pace Program" a proper subject for rebuttal.

The state called Ms. Johnson as a rebuttal witness. Ms. Johnson testified that her office received the applications for Longview's "Pace Program" and that her office had no records of appellant.

■ The scope of rebuttal testimony rests within the broad discretion of the trial court. *State v. Martin,* 651 S.W.2d 645, 652–53 (Mo.App.1983). Any competent testimony which tends to explain, counteract, repel or disprove evidence offered by defendant may be offered in rebuttal of defendant's evidence. *State v. Dizdar,* 622 S.W.2d 300, 302 (Mo.App.1981). The admission of Ms. Johnson's testimony as to appellant's enrollment and application status at Longview was within the discretion of the trial court.

Point II is denied.

■ In Point III, appellant contends the trial court erred in submitting to the jury, instruction number 4 patterned after MAI–CR3d 302.04, defining reasonable doubt. Appellant alleges the instruction violated her rights to due process and a fair trial, in that the instruction defined reasonable doubt as proof that leaves one "firmly convinced" of the defendant's guilt which allowed the jury to convict Ms. Dale based on a quantum of proof less than "beyond a reasonable doubt."

The Missouri Supreme Court initially decided this issue in *State v. Antwine,* 743

---

3. The examiner inadvertently said "Penn Valley" rather than "Longview" but corrected this several questions later.

S.W.2d 51 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). The court held that "firmly convinced" is essentially synonymous with "beyond a reasonable doubt." The court held that MAI–CR3d 302.04 is not unconstitutional. *Id.* The court reaffirmed its *Antwine* decision with *State v. Griffin,* 848 S.W.2d 464 (Mo. banc 1993).

This court is constitutionally bound to follow the last controlling decision of the Missouri Supreme Court. *State v. Weems,* 800 S.W.2d 54, 58 (Mo.App.1990). The MAI–CR3d approved instructions are mandatory and we are prohibited from declaring that an instruction so adopted by the Supreme Court is erroneous. *State v. Franklin,* 752 S.W.2d 937, 939 (Mo.App.1988). We therefore find that the trial court did not err in submitting MAI–CR3d 302.04. Appellant's Point III is denied.

Judgment affirmed.

All concur.