STATE of Missouri, Respondent,

v.

Jeffrey SAMUELS, Appellant.

Nos. WD 52080, WD 54001.

Missouri Court of Appeals,
Western District.

March 31, 1998.

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Blegen, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., and HOWARD and RIEDERER, JJ.

RIEDERER, Judge.

At a hearing on a motion under Supreme Court Rule 29.15, Jeffrey Samuels, the Appellant, while testifying in support of his allegation of ineffective assistance of counsel, admitted incriminating details of the underlying charged offense. In a subsequent retrial, the trial court admitted the incriminating testimony on the ultimate issue of the defendant's guilt. Appellant was convicted at the second trial. On appeal, he alleges 1) that by admitting this testimony, the trial court improperly placed the defendant's Sixth Amendment right to effective assistance of counsel in direct conflict with his Fifth Amendment privilege against self-incrimination; 2) that the reading of a witness' testimony from the first trial at the second trial violated his rights to cross examine and confront witnesses; 3) that the prejudicial im-

pact of Appellant's cocaine use outweighed any probative value, was irrelevant and violated Appellant's constitutional rights to due process and a fair trial; 4) that the prosecutor's closing argument shifted the burden of proof to Appellant and violated his constitutional rights to due process and a fair trial; 5) that the motion court should have granted an evidentiary hearing before denying Rule 29.15 motion regarding two claims of ineffective assistance of counsel; 6) that the trial court should not have accepted the jury verdict because guilt was not established beyond a reasonable doubt; 7) that the trial judge was biased, prejudiced and should have disqualified himself; 8) that the trial court should have submitted "not in MAI–CR" instruction on self-defense to the jury; 9) that trial court should not have submitted instruction on voluntary intoxication to the jury; 10) that the prosecution made impermissible comments on Appellant's failure to testify during closing argument; 11) that Appellant should have been allowed to mention in closing argument that police officers use force in self-defense; 12) that the trial court should have instructed jury on voluntary manslaughter; and 13) that the motion court was biased and prejudiced in presiding over and denying one of Appellant's Rule 29.15 motions regarding ineffective assistance of counsel. Because the first issue is dispositive of the appeal, we do not address the remaining allegations.

### FACTS

At approximately 11:30 a.m. on August 19,1991, the residence manager at the Park Central Apartments in Kansas City, Missouri, heard a number of gunshots in the building. She instructed an employee to call 911. At that same time, Teresa Gilyard, the sister of Appellant Jeffrey Samuels, was speaking with Samuels on the phone. When she heard a commotion, she gave the phone to her husband, Fred Gilyard. He heard the gunshots over the phone and also called 911. Police officers responded to the calls and were directed to Apartment 119, rented by Samuels. The officers entered and found Deanna Lee lying on her back blocking the door. She was dead of multiple gunshot wounds and cocaine was later found in her bloodstream. The officers found a .25 caliber semi-automatic Beretta pistol on a chair in the apartment. This pistol fires the bullets in its magazine in rapid succession without doing anything but pressing the trigger. The officers recovered two spent bullets and seven shell casings at the scene, and five more bullets were removed from Lee's body in the autopsy. All the bullets and casings matched the Beretta pistol.

A tenant informed the police that Samuels had been seen leaving the building with blood on his clothing. Samuels was arrested on September 25, 1991, in Minneapolis, Minnesota.

Jeffrey Samuels was convicted of first degree murder and armed criminal action in 1992. Samuels did not take the stand in that first trial. Following the conviction, Samuels filed a motion under Rule 29.15, raising a number of postconviction claims, including ineffective assistance of counsel. He alleged that his trial counsel failed to present a self-defense theory of defense. In support of this motion, Samuels personally gave detailed testimony about what he claimed to have told his lawyer of his involvement in the homicide. Before the State had an opportunity to cross-examine the Appellant and before the Appellant's trial counsel (whose competence was challenged) testified, the motion court recessed and subsequently granted the 29.15 motion on the grounds of a tainted juror claim. Thus, there is no record of trial counsel's response to the claims of his ineffectiveness. The motion court never ruled on the ineffective assistance of counsel allegation.

At the second trial, the state introduced, over Appellant's objection, the statements from Samuels' testimony at the 29.15 hearing. The trial court held that those statements were admissions against interest. Samuels was again convicted of first degree murder and armed criminal action.

Appellant claims on appeal that admission at his second trial of his statement made at

the postconviction hearing in support of his Sixth Amendment right to counsel is a violation of his Fifth Amendment privilege against self-incrimination. We agree.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In order to properly assess the statements made by Appellant at the 29.15 hearing following his first trial, we must first analyze what Appellant was required to prove at this hearing.

In order to establish ineffective assistance of counsel, the movant must (1) demonstrate that his counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances and (2) show that his defense was prejudiced as a result of that deficiency. *Strickland v. Washington,* 466 U.S. 668, 687, 690, 104 S.Ct. 2052, 2064, 2065–66, 80 L.Ed.2d 674 (1984); *State v. Storey,* 901 S.W.2d 886, 893 (Mo. banc 1995). Defense counsel is presumed to be competent. *State v. Booker,* 945 S.W.2d 457, 459 (Mo.App. 1997). A petitioner alleging ineffective assistance of counsel bears a "heavy burden" to overcome that presumption. *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996). Because the burden is so heavy, general or "naked" allegations of ineffectiveness are not sufficient. *Phillips v. U.S.,* 401 F.Supp. 594, 596 (1975) *affirmed* 533 F.2d 369 (1976), *certiorari denied* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976).

An appellant can make a claim of ineffective assistance of counsel only by specifying particular errors of trial counsel, not founded on mere inexperience, lack of time to prepare, gravity of the charges, complexity of defenses, or accessibility of witnesses to counsel. *United States v. Cronic,* 466 U.S. 648, 665–66, 104 S.Ct. 2039, 2050–51, 80 L.Ed.2d 657 (1984). The error of trial counsel would have to be particularly egregious, as courts will normally not grant relief for acts or omissions by counsel viewed as trial tactics. *Booker,* 945 S.W.2d at 458.

To prove his claim that his trial counsel was ineffective, therefore, Samuels did not make general or naked allegations. Rather, he gave personal testimony detailing private conversations he purportedly had with James McMullin, his lawyer at the first trial. At the 29.15 hearing, Samuels' attorney asked "what it was that you told Mr. McMullin happened while you were talking on the telephone?" In a rambling and lengthy narrative, Samuels revealed the details of what he purportedly told his lawyer. In summary, he stated that in the four days prior to the killing, he had been using drugs and alcohol and had not slept. At least part of that time he had spent with Deanna Lee, the decedent, who was angry with him because he would not buy her more drugs. At the time of the killing, he was on the phone with his sister, Teresia Gilyard. While Appellant was speaking to his sister, Lee began shouting. Samuels continued: "I looked up while I was talking on the phone, and I saw that she had a gun pointed to my head demanding that I give her all of my money, all the money or whatever else like that, everything, rather, so I was shocked. I was shocked at that point in time or whatever else like that, and like I said, things aren't really that clear to me as to exactly what transpired after that because I contacted, because I kind of lost—because things were so magnified that—but I remembered her making a motion as if to pull the trigger or whatever, and going through a struggle or whatever else like that. During the struggle, shots were fired or whatever. We was kind of like in a spinning type motion, and the way the shells were lying inside the apartment, clearly shows that it was a struggle, and it pretty much suffices for what I'm telling you." Samuels said he then thought about calling 911, but "panicked" and fled.

In an effort to overcome the heavy presumption in favor of competent counsel, Samuels was required to reveal to the court the incriminating details he told his attorney before the first trial. He made this revelation of the details of the killing in an effort to substantiate his claim that his counsel breached a duty in not utilizing the affirmative defense of self-defense and that his de-

fense was prejudiced because of the counsel's ignorance of the self-defense claim.

## THE PRIVILEGE AGAINST SELF–INCRIMINATION

The issue before this court is whether the admission of incriminating testimony given at a postconviction hearing to secure the appellant's Sixth Amendment rights is a violation of Appellant's Fifth Amendment right not to incriminate himself where the appellant has properly objected to the admission of the testimony.

■ Generally, a defendant's testimony from his first trial is admissible at his second trial. *State v. Pelz*, 831 S.W.2d 635, 636 (Mo.App.1992). The general rule regarding the admissibility of evidence of this nature is that statements voluntarily made by a defendant in a preliminary examination, or in a former trial—of his or that of another person—may be received against the defendant as his own admissions. *Id.*

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the United States Supreme Court created an exception to that general rule based on the Fifth Amendment's privilege against self-incrimination. In *Simmons*, the defendant moved, pre-trial, to suppress evidence, to wit, a certain suitcase. *Id.* at 381, 88 S.Ct. at 969–70. The defendant testified at the suppression hearing that he was the owner of the suitcase, which contained incriminating materials, in order to establish standing to challenge a search. *Id.* At trial, the prosecution used the testimony at that suppression hearing against the defendant. *Id.* The Supreme Court reversed the defendant's conviction, reasoning that a defendant should not be forced to give up his Fifth Amendment right protecting against self-incrimination to ensure his Fourth Amendment right to be free from illegal search and seizure. *Id.* at 394, 88 S.Ct. at 976–77. The Court held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him

at trial on the issue of guilt unless he makes no objection." *Id.* The defendant had not been "compelled" to testify in the traditional sense of that term; but if he did not testify, he would forego a benefit by giving up his Fourth Amendment right. *Id.* at 393–94, 88 S.Ct. at 975–77. The Court noted that, in the abstract, the testimony might be voluntary, and that testimony to secure a benefit from the Government is not ipso facto "compelled" within the meaning of the self-incrimination clause; but the Court protected that testimony because "the 'benefit' to be gained is that afforded by another provision of the Bill of Rights." *Id.* This scenario created an "undeniable tension" between the Fourth and Fifth Amendments, and left the defendant with a cruel choice. *Id.* at 394, 88 S.Ct. at 976–77. The Supreme Court could not abide by that choice, finding it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.*

## SIXTH AMENDMENT RIGHT TO COUNSEL

■ The United States Supreme Court has not extended this same protection to the Sixth Amendment, but neither have they precluded that possibility. *United States v. Kahan*, 415 U.S. 239, 243, 94 S.Ct. 1179, 1181, 39 L.Ed.2d 297 (1974). In *Kahan*, the Supreme Court held that the admission into evidence of the defendant's false statements, made at arraignment to obtain appointed counsel, did not violate the defendant's Fifth and Sixth Amendment rights because the statements were admitted to prove the defendant's knowledge of their falsity, not to prove their incriminating content on the ultimate issue of guilt. *Id.* Justice Douglas, joined by Justice Brennan, wrote a vigorous dissent, noting that the "principle of *Simmons* ... is applicable, if reason is to prevail, where rights under the Fifth Amendment are entangled with rights under either the Fourth or the Sixth Amendment." *Id.* The consequences of withholding such protection forces a defendant "to gamble his right to remain silent against his need for counsel or his understanding of the requirements for

appointment of counsel." *Id.* (quoting *United States v. Kahan* 479 F.2d 290, 292 (1973)).

The Second and Eighth Circuits have extended *Simmons* protection to certain statements made in the Sixth Amendment context. *United States v. Branker,* 418 F.2d 378 (2nd Cir.1969); *United States v. Anderson,* 567 F.2d 839, 840–41 (8th Cir.1977). In *Branker,* the defendant had testified at a hearing on his efforts to proceed *in forma pauperis.* 418 F.2d at 379. The District Court admitted the testimony from the hearing in the defendant's subsequent trial on the charge of knowingly presenting false claims. *Id.* The Second Circuit Court of Appeals overturned the decision of the lower court. *Id.* The Court, using *Simmons* as a guide, noted that "[t]he defendant should enjoy his constitutional rights to counsel and to appeal and the means of supporting his assertion of these rights by his own testimony without running the risk that thereby he may be incriminating himself with respect to the charges pending against him." *Id.* at 380, 88 S.Ct. at 969. The court added that the constitutional rights to counsel "are no less important than the constitutional rights to protection against illegal searches and seizures and coerced confessions." *Id.* at 381, 88 S.Ct. at 969–70

In *Anderson,* the defendant refused to fill out financial information on a standard form affidavit to proceed *in forma pauperis;* as a result the trial court found that Anderson failed to prove that he was indigent. 567 F.2d at 840. The Eighth Circuit Court of Appeals held that forcing an alleged contemnor to fill out a standard indigency affidavit containing information that might aid in a future tax prosecution was constitutionally impermissible. *Id.* The court noted that "[t]o hold otherwise would force Anderson to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination." *Id.* at 840–41.

In the case at hand, Samuels presented the 29.15 motion court with specific details of his personal knowledge of the crime in an effort to bear the heavy burden necessary to overcome the presumption that counsel is competent. *Booker,* 945 S.W.2d at 459; *Tokar,* 918 S.W.2d at 761. Missouri's case law is weighted down with the failed efforts of countless appellants laboring in vain to shoulder this heavy burden. *See e.g. State v. Schaller,* 937 S.W.2d 285 (Mo.App.1996) (failure to call additional witnesses "virtually unchallengeable" as a matter of trial strategy); *State v. Taylor,* 929 S.W.2d 209 (Mo. banc 1996) (counsel's allegedly inadequate investigation of potential mitigation evidence and failure to call additional mitigation witnesses did not prejudice defendant).

In order to secure his Sixth Amendment right to effective counsel, this defendant had no choice but to testify, just as he did, with specific information of his ineffective counsel. Even with that specific information, it is questionable whether the defendant would satisfy the heavy burden and overcome the presumption of competence. Few motions under Rule 29.15 are ever sustained. With that knowledge, a defendant in Samuels' position is faced with this choice: (1) he can choose not to testify at the 29.15 hearing and thereby protect his Fifth Amendment right, while in effect waiving his Sixth Amendment protection by not presenting enough evidence to shoulder the heavy burden; or (2) he can make a concerted effort to overcome the strong presumption that counsel is competent and waive his Fifth Amendment rights, risking that his testimony will be used against him at trial.

Because the 29.15 motion was granted on other grounds before Samuels presented all his evidence in support of the ineffective assistance claim, neither the motion court nor this court can assess the merits of the claim. However, no one else could have testified to the matters that were the subject of Appellant's testimony.

◼ Because of the strong presumption in favor of competent counsel, the defendant necessarily must specify particular errors of trial counsel to the motion court in order to satisfy the heavy burden in overcoming that presumption. *Cronic,* 466 U.S. at 665–66,

104 S.Ct. at 2050–51. The only evidence this defendant could adduce regarding his claim that his lawyer was ineffective for failing to advance the defense of self-defense would be his own testimony. The only person who could testify about the defendant's communication with his attorney was the defendant himself, and that testimony had to include the details of what he told his lawyer. In such an instance, the Sixth Amendment testimony pertinent to the ultimate issue should be protected if the case is retried. That protection should attach whether the case is retried based on the ineffective assistance charge or on some unrelated trial error. A defendant should not be deterred from invoking the constitutional protection afforded by the Sixth Amendment. As Justice Harlan wrote in his *Kahan* dissent: "One should not have to seek advice on points of law ... before he feels free in asserting his Sixth Amendment rights." *Kahan,* 415 U.S. at 245, 94 S.Ct. at 1182.

Allowing Sixth Amendment testimony at a postconviction hearing to be insulated from use against a defendant in a retrial should not create additional difficulties for courts, nor is the abuse of this rule by convicted defendants so likely, as argued by the state. Rarely will a defendant want or need to describe the details of an alleged crime for the first time in a postconviction hearing. But when one such as Samuels feels that counsel made a serious error that potentially changed the outcome of the trial, he should not be inhibited from testifying to those facts when no alternative method of asserting this right is available.

■ The State expresses some legitimate concern that this result will prevent the State from ever using the statement of defendant. However, there are myriad circumstances under which a defendant's statements, otherwise inadmissible, become admissible, as when a defendant contradicts or denies a previous statement in trial testimony. For example, an otherwise voluntary confession taken in violation of the *Miranda v. Ari-*

zona[1] requirements is admissible at trial for impeachment purposes. *State v. Engel,* 859 S.W.2d 822 (Mo.App.1993); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

In addition, such suppressed statements will sometimes be admissible to prove something other than the ultimate issue. The *Kahan* case established that a defendant's false statements, made at arraignment to obtain appointed counsel, are admissible to prove the defendant's knowledge of their falsity but not to prove their incriminating content on the ultimate issue of guilt. *Kahan,* 415 U.S. at 243, 94 S.Ct. at 1181. These same rules will continue to apply to the sort of statements that are the subject of this case.

Insulating such testimony given at a postconviction motion does not hurt the State. In the unlikely event of a second trial, the State still has all of the evidence that produced the first conviction. In addition, the State will have the benefit of limiting the defenses available, and knowing the details of the defense. The State will be in a better position than it was at the first trial.

Extending Fifth Amendment protection to Samuels' statements made to secure his Sixth Amendment rights is consistent with *Simmons* and *Kahan.* The *Simmons* Court held that Fourth Amendment testimony "may not thereafter be admitted against him on the issue of guilt unless he makes no objection." The *Kahan* Court only admitted the Sixth Amendment testimony to prove the defendant's knowledge of the statement's falsity, not on the issue of guilt. *Simmons,* 390 U.S. at 394; *Kahan,* 415 U.S. at 243, 94 S.Ct. at 1181. The trial court in this case admitted the testimony to prove the ultimate issue of guilt, and is thus distinguishable from *Kahan* and consistent with the concerns of the *Simmons* court.

Just as in *Simmons,* Samuels was not "compelled" to testify in the traditional

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sense; but if he did not testify, he would forego the benefit of his Sixth Amendment right to counsel. Like the defendant in *Simmons*, he is the only one who could give the detailed testimony required to prevail on his motion. Samuels, convicted and sentenced to life imprisonment, chose to testify in an attempt to get a new trial. As a consequence of that choice, his testimony was admitted against him at his second trial. The *Simmons* Court stated that "[i]t seems obvious that a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof" to assert his constitutional claim. *Simmons*, 390 U.S. at 392, 88 S.Ct. at 975. That deterrent effect, present here as in *Simmons*, creates that same type of "intolerable" situation where one constitutional right essentially must be surrendered in order to assert another. *Id.* at 394, 88 S.Ct. at 976–77.

The Sixth Amendment right to counsel is no less important than the Fourth Amendment right to protection against illegal search and seizure and the Fifth Amendment privilege against self-incrimination. One of the foundations of the adversarial trial process is that the defendant has a right not to be compelled to give testimony against himself at his own trial. Another fundamental principle is that a defendant in a criminal case has a right to the effective assistance of counsel. Protecting postconviction testimony in support of the Sixth Amendment right to counsel from use at a subsequent trial upholds both of those basic tenets. We therefore hold that when a defendant testifies at a postconviction hearing in support of a motion alleging ineffective assistance of counsel where the defendant's testimony is indispensable in overcoming the heavy presumption of counsel's competence, that testimony may not be admitted against the defendant at a subsequent trial to prove its incriminating content on the ultimate issue of guilt, unless the defendant makes no objection.

## HARMLESS ERROR

Having found error in the admission of Appellant's testimony, we must now also examine whether this error is prejudicial. *State v. Mayes*, 868 S.W.2d 541, 545 (Mo.App.1993). In addressing trial court errors on appeal, this court reviews for prejudice, not mere error, and will reverse only if error was so prejudicial that it deprived defendant of a fair trial. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996), *rehearing denied, certiorari denied* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). Error committed in a criminal case is presumed to be unfairly prejudicial. *State v. Dale*, 874 S.W.2d 446, 452 (Mo.App.1994). Further, a violation of a constitutional right of this magnitude is presumed to be prejudicial. *State v. Blewett*, 853 S.W.2d 455, 461 (Mo.App. 1993). However, these presumptions are not conclusive and may be rebutted by the facts and circumstances of the case. *Dale*, 874 S.W.2d at 452. Error will be declared harmless only if harmless beyond a reasonable doubt; or, stated in the negative, the error is presumed prejudicial unless it is not prejudicial beyond a reasonable doubt. *State v. Miller*, 650 S.W.2d 619, 621–23 (Mo. banc 1983). In determining harmless error, we consider the circumstances of the error and the quality of the evidence in support of the verdict. *United States v. White*, 794 F.2d 367, 371 (8th Cir.1986).

Cases are legion standing for the proposition that evidence which might be considered prejudicial in a close case can be considered harmless if evidence of guilt is strong. *See e.g. Mayes*, 868 S.W.2d 541; *State v. McMillin*, 783 S.W.2d 82, 99 (Mo. banc 1990), *cert. denied* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). To state it more clearly: in a criminal case, where there is a constitutional violation, we start with the presumption that the error is prejudicial, that is, not harmless. If the presumption stands, then the conviction must be reversed. In order to examine whether the presumption of prejudice is overcome, we must examine whether the properly admitted evidence was so strong and so convincing as to leave this court persuaded beyond a reasonable doubt that the jury would have convicted Appellant of the same charge without

the inadmissible evidence. *Mayes*, 868 S.W.2d at 545. If the properly admitted evidence is that strong, then we must let the conviction stand. *Id.*

The State's evidence in support of conviction, without including the improperly admitted testimony from the 29.15 hearing, consists of the following:

Mischa Forte testified that she was apartment manager at the Park Central Apartments and that Appellant rented apartment 119. On the day in question, she heard gunshots. The shots were rapid-fire with no pauses in between shots.

Sergeant Michael L. Corwin (KCPD) testified that when he responded to the scene after being dispatched from a 911 call, there was smoke in the air in the hallway of the building and that it smelled like gun smoke. When he entered Apartment 119, he found the victim dead on the floor, and her body was blocking the doorway. He further testified that a resident told him that he (the resident) had seen Appellant leaving the building that morning with blood on his pants. Corwin then broadcast a pickup for the defendant.

Lawrence White, police officer (KCPD) testified that he ordered the Appellant's car towed from a residence.

Detective Reed Buente (KCPD) testified that he witnessed the autopsy and identified the bullets taken from the victim's body.

Detective Wayne Owings (KCPD) testified that he recovered certain items from the crime scene. He recovered the gun, the magazine for the gun, a bed sheet, a Playboy magazine and a number of fingerprints, including one from the base of the phone and one from a plastic cup. The evidence further showed that the fingerprint from the base of the phone was that of the Appellant, and the fingerprint from the plastic cup was that of the victim. Owings further testified that the shell casing found at the scene fell in an area 3 feet 8 inches by 8 feet 3 inches. He also testified that the blood splatters on a door hit that door going upward.

Carl Glazer testified about the crime scene, and Kathleen Hentges testified about the fingerprints.

William Newhouse (Regional Crime Lab) testified that the gun was a semi-automatic pistol and that the ammunition was stored in a magazine. The magazine held eight bullets, and one could be placed in the chamber, so that this pistol could fire up to nine bullets, all in rapid succession. A shooter would have to pull the trigger each time to fire each bullet. Newhouse had test-fired the pistol and compared the test bullets with the bullets and casings found at the crime scene. He testified that the bullets and casings from the crime scene were fired from this pistol. He testified about the gunshot wounds and about the stippling patterns around the wounds. He testified that one could not tell where the shooter in this case was standing just from where the shell casings were found.

John T. Wilson (Regional Crime Lab) testified about blood splatters, saying that most of the blood splatters in this case were medium velocity blood splatters. The blood splatters here were consistent with the victim spinning about. Some of the drops of blood had dropped straight down. Wilson testified that he believed the victim was lying down or almost lying down when some of the bullets entered her body.

Catherine Lee, the victim's mother, testified that the victim was right handed and that the victim did not carry a gun.

Rebecca Fleming testified about the 911 calls.

Detective George Barrios (KCPD) testified that he arrested Appellant in Minneapolis and that, at that time, Appellant gave him the false name of John Samuels.

A transcript of Alvin Wilson's testimony was read into the record. He saw Appellant and the victim at the apartment of Daryl Williams earlier on the morning of the shooting. Wilson testified that Appellant and the victim spent thirty minutes to an hour together in the bathroom, and the two were not fighting or arguing. Appellant made two

phone calls, and on one of the phone calls, Appellant told the person on the line that he was "spooked" and to "[b]ring my thing and make sure it is loaded."

Michael E. Berkland, the Medical Examiner, testified that the victim died of multiple gunshot wounds. Two of the wounds were consistent with defensive wounds, inflicted on parts of the arms or hands in places where wounds would not normally be found except in cases where the victim raises her arms or hands in a defensive posture. Five of the wounds were inconsistent with the victim being the shooter. Two of the wounds were consistent with the victim being on the ground when shot or falling to the ground immediately after being shot.

In summary, the State's evidence establishes:

(1) Appellant rented Apartment 119.

(2) Victim was found dead in Apartment 119.

(3) Victim and Appellant were together a few hours earlier.

(4) The night before the killing, Appellant was heard telling someone that he was "spooked" and to "[b]ring my thing and make sure it's loaded."

(5) Appellant was seen leaving crime scene with blood on his pants.

(6) Appellant was arrested in Minneapolis, and gave a false name.

(7) Victim died of multiple gunshot wounds.

(8) Five wounds were inconsistent with victim being the shooter.

(9) Two wounds were consistent with being defensive wounds.

(10) Murder weapon could fire up to 9 rounds in rapid succession.

(11) Shooter had to pull the trigger a separate time for each bullet.

### Deliberation

■ Review of the evidence in this case leads this court to conclude that it is convinced beyond a reasonable doubt that there is sufficient evidence in the case to conclude that Appellant shot this victim and that it was not done in self defense. The question is closer, however, on the issue of whether it is clear beyond a reasonable doubt that the Appellant is guilty of first degree murder rather than second degree murder.

The key, of course, is deliberation. It is murder in the second degree if Appellant "knowingly causes the death of another person." Section 565.021 RSMo (1994). It is murder in the first degree if Appellant "knowingly causes the death of another person after deliberation upon the matter." Section 565.020 RSMo (1994). If the properly admitted evidence in the case leaves this court convinced beyond a reasonable doubt that this jury would have found that Appellant killed this victim "after deliberation upon the matter," even without the inadmissible testimony, then the conviction must stand.

■ Deliberation means cool reflection for any length of time no matter how brief. Section 565.003 RSMo (1994). To prove deliberation there must be some evidence that the defendant made a decision to kill the victim prior to the murder. *State v. Williams*, 945 S.W.2d 575, 579 (Mo.App. 1997); *State v. Gray*, 887 S.W.2d 369, 377 (Mo. banc 1994). Only first degree murder requires the cold blood, the unimpassioned premeditation that the law calls deliberation. *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993). The deliberation necessary to support a conviction of murder in the first degree need only be momentary; it is only necessary that the Appellant considered taking the victim's life in a deliberate state of mind. *State v. Clark*, 913 S.W.2d 399, 404 (Mo.App.1996). That deliberation may be inferred from circumstances surrounding the murder. *State v. Beishline*, 926 S.W.2d 501, 511 (Mo.App.1996). Deliberation may be inferred from multiple gunshot wounds. *Clark*, 913 S.W.2d 399 at 404. Additionally, the inference of deliberation can be made from the fact that a defendant left the scene immediately after the shooting without

checking on the victim or procuring aid for her. *State v. Howard,* 896 S.W.2d 471, 481 (Mo.App.1995).

However, the victim was killed by a semi-automatic pistol which fired rapidly. All seven bullets could have been fired in the span of three seconds. Multiple gunshot wounds do not conclusively establish deliberation and thus guarantee that a jury will convict defendant of first degree murder. *See e.g., State v. Coats,* 936 S.W.2d 852, 853 (Mo.App.1996) (Defendant shoots five times, kills two and an unborn baby and convicted of three counts of second degree murder); *State v. Ralls,* 918 S.W.2d 936, 937 (Mo.App. 1996) (Defendant kills victim with three shots to the head and convicted of second degree murder).

In this case, no witnesses saw the shooting. All the evidence of Appellant's guilt besides the improperly admitted testimony was circumstantial. Without the inadmissible testimony, the jury conceivably could have construed the evidence as supporting a conviction of first degree murder or second degree murder. Because of the fact that victim was shot seven times, a jury could reasonably find that the multiple shots establish deliberation, but multiple shots do not establish deliberation conclusively. A jury could also reasonably find that because victim was shot rapid-fire by a semi-automatic pistol and because Appellant was on the phone when the killing occurred, deliberation was lacking.

This court is not convinced beyond a reasonable doubt that the jury would have convicted Appellant of first degree murder instead of second degree murder without the improper testimony. Appellant's testimony cannot be separated from the other evidence admitted against him in assessing the testimony's impact on the jury's decision to convict Appellant of first degree murder. Only in Appellant's testimony were the most specific details revealed of the time leading up to the killing and of the killing itself. Only through Appellant's testimony was it proven that it was he alone who was in Apartment 119 with Deanna Lee when the shots were fired and Lee was killed. In addition, the confession of a defendant is "probably the most probative and damaging evidence that can be admitted against him," *Cruz v. New York,* 481 U.S. 186, 195, 107 S.Ct. 1714, 1720, 95 L.Ed.2d 162 (1987) (White, J., dissenting), so damaging that a jury can not be expected to ignore it even if instructed to do so. *Bruton v. United States,* 391 U.S. 123, 140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting). A court cannot determine what credit and weight the jury gave to the confession. *Arizona v. Fulminante,* 499 U.S. 279, 292, 111 S.Ct. 1246, 1255, 113 L.Ed.2d 302 (1991).

This court cannot know what credit and weight this jury gave to Samuels' testimony in reaching its verdict, and we are not persuaded beyond a reasonable doubt that the Appellant would have been convicted of first degree murder without the inadmissible evidence. *Mayes,* 868 S.W.2d at 545.

Defendant's testimony became a central focus for both the State and the Defense in closing arguments. The record reveals that the State referred to Appellant's testimony ten times during closing argument. Appellant's statements were an integral part of the proof in the State's case-in-chief and of the State's argument to the jury. In addition, the Defense was forced to utilize Appellant's testimony in its closing argument in an attempt to refute the arguments of the State. This court cannot find that this evidence did not affect the jury's decision to convict on first degree murder as opposed to second degree murder. The circumstances of this error and the evidence in support of the verdict do not rebut the presumption of prejudice. Therefore, we find that Appellant was prejudiced by the improper admission of the testimony.

For the foregoing reasons, we reverse the judgment of the trial court and remand the case for a new trial.

It is so ordered.

All concur.