**STATE of Missouri, Respondent,**

v.

**Cornelle D. WILLIAMS, Appellant.**

**No. WD 62190.**

Missouri Court of Appeals,
Western District.

May 25, 2004.

Ellen H. Flottman, Asst. State Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty Gen., Anne E. Edgington, Asst. Atty Gen., Jefferson City, for Respondent.

Before: LOWENSTEIN, P.J., and EDWIN H. SMITH and HOWARD, JJ.

EDWIN H. SMITH, Judge.

Cornelle D. Williams appeals the judgment of his convictions, after a jury trial in the Circuit Court of Platte County, for murder in the second degree, § 565.021;[1] assault in the first degree, § 565.050; and two counts of armed criminal action (ACA), § 571.015. As a result of his convictions, the appellant was sentenced to concurrent terms of imprisonment in the Missouri Department of Corrections of thirty years for second-degree murder and forty years for the accompanying count of ACA, to run consecutively to concurrent terms of fifteen years for first-degree assault and forty years for the accompanying count of ACA.

In his sole point on appeal, the appellant claims that the trial court erred in denying his request for state funds to retain an expert witness because the state was required, as a matter of due process, to provide him with a meaningful opportunity to prepare and present a defense at trial, and that without state funds he was not able to retain an expert witness who was

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

vital to his defense, such that he was denied a meaningful opportunity to prepare and present a defense at trial.

Affirmed.

### Facts

On February 24, 2001, the appellant and a friend, Kevin Johnson, went to the Wire Wheel Warehouse located on Truman Road in Kansas City, Missouri, to look for tires for the appellant's car. Rusty Clinton, who was working as a cashier at the store, told the appellant and Johnson that he had a friend, Nathan Quick, who had wheels for sale. Quick was in the store at the time, so Clinton introduced Johnson to him. They talked, and Quick agreed to sell a set of wheels to Johnson for $300 to $400.

Having struck a deal, the parties proceeded in separate vehicles to Quick's apartment, where the wheels were located. Quick and Clinton both drove their cars, while the appellant rode with Johnson in his car. Before leaving the store, Johnson told the appellant that he planned on stealing the wheels from Quick, while Clinton confided in Quick that he did not trust the appellant and Johnson. At that point, Clinton told him not to worry about it, showing him a small handgun, which he had in his pocket.

When the men arrived at Quick's apartment, Johnson inspected the wheels and told Quick that he would buy them. Johnson loaded the wheels in his car, while Quick, Clinton, and the appellant smoked some marijuana. Johnson then returned to the apartment and asked Quick how much he wanted for the wheels. Quick said he wanted $300. Johnson offered to pay a lesser amount and give him some marijuana instead, but Quick declined. Johnson then began to count out the money for the wheels, but told Quick he would have to go to his car to get the rest of the money and left. When Johnson returned to the apartment, he told the appellant that he could not find any more money in the car. The appellant told him to look in the glove compartment. Johnson and the appellant then both started to leave, but Quick asked the appellant to stay behind, stating "you know how people are ... I just don't want you to go out to the car and just leave and gyp us." The appellant agreed to stay in the apartment, while Johnson went out to the car for more money.

Once Johnson returned, he pulled out a wad of money and started flipping through it. At some point, the appellant, without warning, pulled out a handgun and shot Clinton once in the head. The appellant then turned and shot at Quick, who dropped to the floor to avoid being shot. The appellant and Johnson then ran out of the apartment and drove away. Quick was unhurt, but Clinton died from his gunshot wound. As a result, on April 5, 2001, the appellant was charged by information in the Circuit Court of Platte County with murder in the second degree, assault in the first degree, and two counts of ACA.

On January 24, 2002, the appellant filed a "Motion for Leave of Court to File *ex parte* Motion for Funds," citing *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In his suggestions in support of his motion, the appellant contended that although he had hired private counsel, he was without funds to hire an expert witness necessary to his defense, imposing an obligation on the state to provide funds for that purpose. He also contended that his request for funds could and should be heard *ex parte* to shield confidential defense matters from the state. On February 7, 2002, the appellant also filed a "Motion for Funds," in which he sought state funds "for an expert to evaluate [his] mental state ... at the time of

the offense and his competency to proceed, and to advise the defense on the availability and presentation of mental defenses." In support of his motion, the appellant alleged that he:

> [had] been involuntarily committed on two separate occasions. He was diagnosed in 1998 and 1999 with Schizophreniform type psychosis. Discharge summaries reflect that diagnosis and his Axis V Global Assessment functioning at time of discharge in 1998 was 60 at his discharge in 1999 it was 55. At the time of his admission in 1998 defendant's Axis V was 35. Defendant's state of mind at time of the offense is clearly at issue. In addition, undersigned counsel has an obligation to investigate the defendant's competency to proceed.

At that time, the appellant had not entered a plea of not guilty by reason of mental disease or defect (NGRI) or filed the requisite notice of his intent to rely on such a defense, in accordance with § 552.030, nor had he challenged his competency to stand trial, in accordance with § 552.020.

The appellant's motions of January 24 and February 7 were taken up and heard on February 7 and denied. The defense argued at the hearing that, given the appellant's history of mental health problems, to adequately prepare for trial, it needed to employ "its own psychiatric expert to do [its] own initial evaluation." Specifically, the defense argued that it could not determine whether to proceed with a NGRI defense without such an eval-

uation. It also argued that it needed expert advice on how to proceed on such a defense, it asserted.

In objecting to the appellant's motion, the state argued that the provisions of § 552.020, with respect to competency to stand trial, and the provisions of § 552.030, with respect to the defense of NGRI, were sufficient to provide the appellant with the mental evaluation he sought such that there was no need for the defense to employ its own expert for purposes of such an evaluation.[2] After hearing the evidence, the trial court denied the appellant's motion and ordered him evaluated, in accordance with § 552.020, to determine if he was competent to proceed to trial. The trial court offered to have the appellant evaluated pursuant to § 552.030, to determine if he could be held criminally responsible for his acts, but the appellant declined.

On February 27, 2002, the appellant filed a "Motion for Confidential Consultation," in which he sought an order of the trial court "directing that a confidential examination be conducted by the Department of Mental Health addressing the mental health of the defendant at the time of the alleged defense." The motion was taken up and heard on the same day. Counsel for the appellant argued that at the time of the hearing, he did not have enough information to determine whether to rely on the defense of NGRI at trial and that the purpose of the private and confidential examination was to provide that

---

**2.** The state's argument, with respect to the defense of NGRI, overlooked the fact that a court-ordered examination for purposes of § 552.030 is not triggered, unless and until the defendant "has pleaded mental disease or defect excluding responsibility or has given the written notice provided in subsection 2 of [§ 552.030]." Section 552.030.3. Hence, the availability of a court-ordered mental examination, as provided in § 552.030, is irrelevant

in determining whether the appellant was entitled to state funds for conducting a private evaluation to determine whether to plead the defense of NGRI or file the requisite notice of reliance on that defense. In addition, the state's argument overlooked the fact that the appellant was not only seeking the private evaluation to determine the availability of the defense, but expert advice on how to present the defense.

information without any disclosure to the state. In that regard, the defense argued:

Your Honor, I would just reiterate that *Ake* requires more than just he be evaluated. It requires specifically expert assistance and that means an expert that will consult with me about strengths and weaknesses of any potential defense and how to address any opposing experts that may come up.

And that's specifically the type of issue and the type of expert that *Ake* talked about. And I don't think *Ake* talked about just the evaluation. They talk about expert assistance and that's what I'm required [*sic*].

And by its nature, that expert assistance has to be confidential or it's more or less worthless to the defense.[3]

The motion was denied.

On April 15, 2002, the appellant filed "Objections to Findings and Request for a Second Mental Evaluation," objecting "to the contents and conclusions of the report filed April 8, 2002 and request[ing] a second evaluation of the defendant pursuant to Chapter 552 R.S.Mo." The report indicated that the appellant was competent to stand trial and was not suffering from a mental disease or defect at the time of the crime that would have relieved him of criminal responsibility. In addition to his objections and request for a second evaluation, the appellant also filed a motion to dismiss and a motion for funds for a second examination. On June 27, 2002, the appellant's objections to the report and request for a second evaluation were taken up and heard, along with his motion to dismiss and his motion for funds.

In his objections, the appellant complained about that portion of the report concerning a § 552.030 evaluation because the trial court's order limited the evaluation to a § 552.020 evaluation for competency. It is not apparent from the record whether the appellant, in objecting to this deviation from the trial court's order, was asking the court to strike the § 552.030 evaluation from the report, so that it could not be used against him in any subsequent proceeding to determine his mental state at the time of the crime, or was simply objecting as a basis for being allowed a second examination. Of course, no showing is required for a second examination under § 552.030. Section 552.030.3 expressly provides that, within ten days after receiving a copy of the report of the first examination, "both the accused and the state shall, upon written request, be entitled to an order granting them an examination of the accused by an examiner of such accused's or its own choosing and at such accused's or its expense." As to a second § 552.020 examination, § 552.020.11(2) provides that, within ten days after receiving a copy of the report of the first examination, "both the accused and the state shall, upon written request, be entitled to an order granting them an examination of the accused by a psychiatrist or psychologist, as defined in section 632.005, RSMo, or a physician with a minimum of one year training or experience in providing treatment or services to mentally retarded or mentally ill individuals, of their own choosing and at their own expense." In any event, the trial court interpreted the appellant's objections as simply going to his request for a second examination and ordered an examination pursuant to Chapter 552, without specifying the purpose of the examination, bearing in mind

---

**3.** As the state pointed out, the defense's obsession with disclosing anything to the state, in the course of the examination, that might be used against the appellant at trial, is tempered by the fact that § 552.030.5 prohibits the state from using any statements made by the defendant or information obtained during the examination to prove his guilt.

that the appellant had not yet entered a NGRI plea or filed a notice of reliance on that defense that would trigger a § 552.030 evaluation.

Having ordered a second evaluation, the trial court then took up the appellant's motion to dismiss. In that motion, the appellant argued that the charges against him should be dismissed because the evaluation conducted violated the trial court's order, which limited the evaluation to a § 552.020 evaluation. Counsel argued that the appellant, when initially questioned during the examination about the crime and his mental state at the time, refused to answer the doctor's questions, advising that he had been instructed by counsel not to answer in that the only purpose of the evaluation was to establish his competency to proceed to trial. From this, counsel argued that the state had violated his client's right to remain silent, requiring a dismissal. The appellant's motion to dismiss was overruled.

The trial court then took up the appellant's motion for funds for a second evaluation, which essentially mirrored his first motion for funds. In his motion, the appellant requested the "court to make available funds necessary to engage a psychiatric expert to evaluate defendant and to advise the defense." The appellant was the only witness called in support of his motion. He testified under oath:

Q. Now it's true that you and your family hired me to represent you; is that correct?

A. That's correct.

Q. Now that was using a combination of your funds and your family—funds that your family had available; is that right?

A. That's also correct.

Q. Do you have any further funds available?

A. No, I do not.

Q. Do you have any assets that are available to you now or any bank accounts or anything of that nature that you could use?

A. No, I do not.

The only other evidence offered in support of his motion was Exhibit A, which was a summary of the appellant's discharges from a mental health facility. The motion was overruled, immediately after which appellant's counsel requested findings of fact and conclusions of law, which was denied by the trial court. Appellant's counsel then stated for the record:

I'd like the record to be clear that if it's [the denial of the motion] a failure of proof, that it was not made for any tactical reasons but because of a novelty situation. I have presented the evidence that I thought was appropriate. And that it's not for tactical reasons that I failed to call any witnesses or present any evidence.

On July 3, 2002, the appellant filed a motion to reconsider the trial court's ruling. On the same date, the trial court entered a written order for a mental examination, without designating the purpose of the examination.

On October 4, 2002, at a pretrial conference, counsel for the appellant brought to the trial court's attention the fact that his motion of July 3, to reconsider his "motion for funds for second evaluation and request for findings of fact and conclusions of law," was still pending. At that time, counsel also advised the trial court that, pursuant to § 552.020.7, his objections of April 15 to the April 8 report contested the examiner's opinion expressed in the report concerning the appellant's competency to stand trial, requiring a hearing on that issue, which was never held. He then requested that the hearing be held prior to the trial. The trial court scheduled the

hearing for October 8, 2002, with the jury to be selected on October 7 and evidence to commence on October 9.

On October 8, 2002, after conducting a hearing pursuant to § 552.020, the court found the appellant competent to stand trial. . The appellant's case proceeded to a jury trial that afternoon. Johnson and Quick both testified as witnesses for the state. Quick testified, *inter alia*, that although Clinton had a handgun in his pocket when they left the Wire Wheel Warehouse, he did not see Clinton draw that gun before he was shot.

The appellant testified in his own defense, and claimed that the shooting occurred after an argument broke out between Johnson and Quick over the price of the wheels. According to the appellant, he saw Clinton draw a gun as Johnson and Quick "hollered" at each other. The appellant claimed that, in self-defense, he reached for his own gun and shot Clinton and then fired at Quick because he was afraid that Quick, too, was armed.

On October 10, 2002, the jury returned guilty verdicts against the appellant on all four counts. On November 20, 2002, the appellant was sentenced to concurrent prison terms of thirty years for second-degree murder and forty years for the accompanying count of ACA, to run consecutively to concurrent terms of fifteen years for first-degree assault and forty years for the accompanying count of ACA.

This appeal followed.

## I.

■ In his sole point on appeal, the appellant claims that the trial court erred in denying his request for state funds to retain an expert witness because the state was required, as a matter of due process, to provide him with a meaningful opportunity to prepare and present a defense at trial, and that without state funds he was not able to retain an expert witness who was vital to his defense, such that he was denied a meaningful opportunity to prepare and present a defense at trial. Specifically, he contends that his mental state at the time of the crimes charged and trial was significant to his defense such that it was vital for him to retain an expert who could conduct a private and confidential mental examination and could advise and assist the defense in preparing and presenting any mental defenses at trial. He further contends that although he was represented by private counsel, rather than the public defender, he was indigent and thus, was entitled, as a matter of due process, to public assistance to retain such an expert.

■ Logically, we review the trial court's denial of the appellant's motion for state funds to hire an expert witness to determine if it is supported by the law and facts. In our review we are to defer to the trial court's factual findings, but review questions of law *de novo. State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).[4] In our review of the facts, we are to view them in the light most favorable to the trial court's ruling challenged on appeal, *State v. Weddle*, 18 S.W.3d 389, 391 (Mo. App.2000), deferring to the trial court's superior opportunity to determine the credibility of witnesses. *Rousan*, 961 S.W.2d at 845.

The extent to which a defendant, who retains private counsel and then becomes indigent, is entitled to retain an expert at

4. We note that *State v. Albright*, 843 S.W.2d 400, 402 (Mo.App.1992) stated that a decision concerning a defendant's eligibility for the services of a public defender is reviewable under *Murphy v. Carron*; however, that standard of review clearly does not apply to a pretrial ruling in a criminal case.

public expense, does not appear to be an issue which is clearly defined in Missouri law. In *State v. Young*, 701 S.W.2d 429, 433 (Mo. *banc* 1985), the Missouri Supreme Court held that a criminal defendant is not entitled by law, constitutional or statutory, to have expert witnesses summoned at state expense. Rather, it held that: "Whether to provide public funds to aid an accused in the preparation of his defense is within the discretion of the trial court." *Id.* (citations omitted).[5] However, *State v. Young* was decided approximately ten months after *Ake v. Oklahoma*, in which the United States Supreme Court held that:

> [W]hen a defendant demonstrates to the trial judge that his insanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in *evaluation, preparation, and presentation of the defense.* This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (emphasis added).

■ In *State v. Tokar*, 918 S.W.2d 753, 765 (Mo. *banc* 1996), the Missouri Supreme Court recognized *Ake* as seeking "to provide an indigent criminal defendant the resources to defend himself, without the need to reveal his defense strategy to the state." In *Tokar*, the State argued that *Ake* was limited to cases involving the defense of NGRI and did not apply to cases involving competency to stand trial. 918 S.W.2d at 765. In response to that argument, the Court stated: "This may be so, but even if [*Ake* ] applies to competency issues as well, it would not apply in this case." In any event, whether *Ake* applies or not to the case at bar, for the appellant to be entitled to state funds to retain the expert witness he desired, he had the burden of showing below that he was, in fact, indigent. *State v. Huchting*, 927 S.W.2d 411, 419 (Mo.App.1996). In that regard, the fact that the appellant had retained private counsel did not result in his forfeiting his eligibility for state assistance in paying for expert witnesses. *Id.* However, in *Huchting*, the Eastern District of this court held that "by analogy to court-appointed counsel procedures that an affidavit of indigence is a pre-requisite for requesting funds to employ an expert witness," noting that a "defendant seeking court-appointed counsel is required by statute to file an affidavit of indigence," citing § 600.086.3.[6] *Id.*

Although in our case no affidavit of indigency was filed by the appellant, he did testify at trial concerning his lack of funds

---

**5.** The Court did consider, without adopting, the standard found in *Williams v. Martin*, 618 F.2d 1021 (4th Cir.1980), which it stated as "requir[ing] public funding of a criminal defendant's expert when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance." *Young*, 701 S.W.2d at 433–34 (citations omitted).

**6.** Section 600.086.3 provides, in pertinent part: "Any such person claiming indigency shall file with the court an affidavit which shall contain the factual information required by the commission under rules which may be established by the commission in determining indigency."

to employ the expert witness he deemed necessary to his defense:

Q. Now it's true that you and your family hired me to represent you; is that correct?

A. That's correct.

Q. Now that was using a combination of your funds and your family—funds that your family had available; is that right?

A. That's also correct.

Q. Do you have any further funds available?

A. No, I do not.

Q. Do you have any assets that are available to you now or any bank accounts or anything of that nature that you could use?

A. No, I do not.

The appellant's sworn testimony, however, does not remotely approach the type of information required by the affidavit of indigency contemplated by § 600.086.3 for the appointment of appointed counsel. 18 C.S.R. 10–3.010 establishes the guidelines for a determination of indigency for the purposes of § 600.086.3, including whether the defendant is receiving disability payments, unemployment compensation, Social Security, or some kind of pension; as well as spouse's income, and parent's income if the defendant is under eighteen, or if the defendant is dependent upon parents or when the parents or a relative post bond; and bank accounts, jewelry, vehicles, insurance equity, stocks and bonds, and any other financial assets. Obviously, the appellant's mere conclusory statement at trial that he did not have "any assets" or "any bank account or anything of that nature" failed to rise to the level of information required by the affidavit. And, in any event, given the paucity of evidence in the record concerning the appellant's indigency, we cannot say that the trial court erred in denying his request for state funds to employ an expert witness. *Huchting*, 927 S.W.2d at 419 (holding that, without proof of indigence, a trial court will not be found to have committed error by refusing to grant funds for retaining an expert).

### Conclusion

The judgment of the Circuit Court of Platte County, convicting the appellant of murder in the second degree, assault in the first degree, and two counts of ACA, is affirmed.

LOWENSTEIN, P.J., and HOWARD, J., concur.