STATE of Missouri, Respondent,

v.

Cornelle D. WILLIAMS, Appellant.

No. WD 72556.

Missouri Court of Appeals, Western District.

April 17, 2012.

Application for Transfer to Supreme Court Denied May 29, 2012.

Michelle D. Carpenter and Lindsey C. Bachman, St. Joseph, MO and Susan L. Hogan, Kansas City, MO, for appellant.

Shaun J. Mackelprang and Richard A. Starnes, Jefferson City, MO, for respondent.

Before Division Three: JAMES E. WELSH, Presiding Judge, CYNTHIA L. MARTIN, Judge and ZEL M. FISCHER, Special Judge.

CYNTHIA L. MARTIN, Judge.

Cornelle Williams ("Williams") was convicted in October 2002 of murder in the second degree, assault in the first degree, and two counts of armed criminal action. His conviction was affirmed on direct appeal, but reversed in a Rule 29.15 proceeding where Williams demonstrated ineffective assistance of counsel. On retrial, Williams was again convicted following a jury trial of murder in the second degree, assault in the first degree, and two counts of armed criminal action. Williams claims on appeal that the trial court erred in permitting his testimony from the first trial to be read to the jury in the second trial over his objection. Williams also claims that the trial court erred in overruling his objections to the State's references during opening statement, on cross examination, and in closing argument, to Williams's participation in a robbery when Williams was not charged with robbery. We affirm.

## Factual and Procedural History

The sufficiency of the evidence to convict Williams is not at issue in this appeal.[1] On February 24, 2001, Williams and his friend, Kevin Johnson ("Johnson") went to Wheel Warehouse on Truman Road in Kansas City, Missouri in Williams's white Chevy Monte Carlo. Williams needed to buy a new tire for another vehicle he owned. Williams spoke with Rusty Clinton ("Clinton"), an employee, about tires. Clinton offered to make Williams a deal for two tires he owned personally. Johnson asked Clinton whether he knew of any used or cheap wheels for sale. Clinton introduced Johnson to his friend Nathan Quick ("Quick") who just happened to be in the store. Quick told Johnson he had four wheels for sale. Quick and Johnson discussed a price of between $300 and $400. Johnson showed Quick a wad of cash that appeared to be enough to buy the wheels. Quick told Johnson that he and Williams could follow him to his apartment. Quick felt uncomfortable meeting with strangers at his apartment, so he asked Clinton to come along.

Clinton dropped his car off at his residence, and then got into Quick's vehicle. Quick headed to Clinton's mother's house to get the tires Clinton had agreed to sell Williams. Then Quick and Clinton set out for Quick's apartment. Williams and Johnson were following in the Monte Carlo.

Before arriving at his apartment, Quick told Clinton he was feeling uneasy. Clinton assured Quick everything would be fine and told Quick that "if anything happens I just happened to grab this," pulling

---

1. We view the evidence in the light most favorable to the verdict. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984).

a small chrome handgun from his front pants pocket.

Traveling behind Quick, Johnson told Williams that he planned to "get over" on Quick, meaning that he planned to steal the wheels or give Quick less money than he asked for. Williams did not respond, but nodded his head. When Quick stopped at Clinton's mother's house, Williams placed a 9 mm Intratec semiautomatic pistol that he kept in the Monte Carlo in the sleeve of his jacket.

Upon arriving at Quick's apartment, Quick and Clinton brought out two of the four wheels to show Johnson. Johnson agreed to buy the wheels, but wanted to see if they would fit in the trunk. While the two wheels were being loaded in the trunk, Williams loaded the tires that Clinton was selling him into the back seat.

Johnson asked to see the other two wheels. Quick and Johnson brought the other two wheels out, but left one by the entrance to the building so Johnson and Williams would not leave without paying. The trunk was now full, and would not close. Johnson tied it down with a t-shirt, and used the shirt to cover the Monte Carlo's license plate.

In the apartment, Quick told Johnson he needed $400 for the wheels. Johnson counted his money but said he was short. He went out to the car reportedly to look for extra money. Williams remained in the apartment. Johnson returned. He claimed he was still short of money. Quick said he would take $300 for the wheels. Johnson again said he needed to look for "extra money" in the car. He asked Williams to come with him, but Quick asked Williams to stay in the apartment, fearing the men intended to leave without paying.

Johnson again returned to the apartment. By now, Clinton was sitting on the couch watching television. Johnson began haggling with Quick over the price for the wheels. Suddenly, Williams pulled the gun from his sleeve, shot Clinton in the face, and shot twice at Quick. Quick ducked and dropped to the floor to avoid being shot. Williams hollered at Johnson "come on, come on." The two ran from the apartment.

Quick heard Williams and Johnson fleeing down the apartment steps. He got up and saw Clinton still sitting on the couch, bleeding from his head. Clinton jumped up and pulled his gun from his pants pocket. Clinton stumbled toward the door, dropping the gun. Quick called for help as Clinton crawled through the apartment. Clinton was airlifted to the hospital where he died from a gunshot wound which entered his right cheek beneath his eye, severed numerous arteries and veins, and exited out his neck below and behind his left ear.

Around 11:00 p.m. that evening, the Kansas City police found Williams's Monte Carlo parked in the 400 block of Highland. Its license plate had been stolen from another vehicle. Johnson got out of the vehicle, saw the officers, got back into the vehicle for a few seconds, got back out of the vehicle, and locked the doors. The police ordered Johnson to halt, but he began running. Johnson was arrested after a foot chase.

In the Monte Carlo, the police recovered paperwork belonging to Williams and the t-shirt Johnson had used to tie down the trunk. The police also found Williams's gun which Johnson had thrown down during the foot chase. Testing demonstrated that the gun had been fired at the scene of Clinton's murder.

Johnson made statements to the police. He told the police that all four of the wheels and the two tires were at his grandmother's house, where they were re-

covered. Johnson led the police to Williams's apartment which was on Highland in the same block where the Monte Carlo had been located. Williams was found in his apartment hiding in a closet. He was arrested.

While both Johnson and Williams were in custody, Williams passed Johnson in the hall. Williams told Johnson to say that Clinton had a gun out before Williams shot him. Johnson, however, had not seen Clinton with a gun, and testified to that fact. Quick also testified that he did not see Clinton pull out his gun before Williams shot him.

Over Williams's objection, the State in its case-in-chief read Williams's testimony from his first trial[2] where Williams had claimed self-defense. Williams also testified during his case-in-chief, and claimed that he saw the gun in Clinton's hand and believed he was going to be shot if he did not shoot first. Williams testified that he shot at Quick because he feared Quick might also have a gun. Williams's testimony in the second trial and the testimony read to the jury which Williams gave in the first trial were not materially distinguishable.

The case was submitted to the jury with self-defense instructions. Williams was convicted of murder in the second degree, assault in the first degree, and two counts of armed criminal action. He was sentenced according to the jury's recommendations to twenty-five years for murder, ten years for assault, and five years for each of the counts of armed criminal action, with each of the sentences running consecutively for a total sentence of forty-five years.

Williams filed this timely appeal.

## Analysis

Williams raises two points on appeal. In his first point, Williams claims the trial court erred in permitting his testimony from the first trial to be read to the jury in his second trial. Williams complains that his testimony in the *first* trial was compelled in violation of his Fifth Amendment privilege against self-incrimination because he was left with no choice but to claim self-defense after his trial counsel's ineffectiveness resulted in Williams's ineligibility to receive State funds to pay for an expert to assess the availability of a mental health defense negating criminal responsibility. Williams also claims that his testimony in the *second* trial was compelled in violation of his Fifth Amendment privilege against self-incrimination because the trial court's erroneous admission of the testimony from the first trial left Williams with no choice but to similarly claim self-defense in the second trial.

In his second point, Williams claims the trial court erred in overruling his objections to the State's several references to his participation in a robbery, though he was not charged with robbery. Williams claims the references to an uncharged crime were erroneously admitted to show his propensity to commit the crimes with which he was charged.

## Standard of Review

■ Both of Williams's points on appeal claim error with respect to the admission of evidence. A trial court is invested with broad discretion in determining whether to admit evidence, and a ruling with respect to the admission of evidence will not be disturbed on appeal absent an abuse of discretion. *State v. McElvain*, 228 S.W.3d

2. The testimony had been cleansed of any references that might suggest it had been taken from Williams during a prior trial. The testimony was referred to as having been taken in a "prior proceeding."

592, 595–96 (Mo.App. W.D.2007). An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to indicate a lack of careful consideration. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). Though we review the trial court's decision to admit evidence for abuse of discretion, "[w]hether a defendant's constitutional rights were violated is a question of law reviewed *de novo.*" *State v. Nunnery,* 129 S.W.3d 13, 17 (Mo.App. S.D.2004).

## Point I

In his first point, Williams claims that his testimony during his first trial was compelled in violation of his Fifth Amendment privilege against self incrimination, and that its erroneous admission had the effect of compelling his testimony in his second trial in violation of his Fifth Amendment privilege. We disagree.

■ It is the general rule in Missouri that " 'statements voluntarily made by a defendant on preliminary examination, or on a former trial of himself or another person, may be received against the defendant as his admissions.' " *State v. Pelz,* 831 S.W.2d 635, 636 (Mo.App. W.D.1992) (quoting *State v. Long,* 324 Mo. 205, 22 S.W.2d 809, 813 (1929)). As a result, the admission of a defendant's prior testimony is not viewed as "compelled testimony" offered in violation of the defendant's constitutional privilege against self incrimination. *State v. Garrett,* 825 S.W.2d 954, 959 (Mo.App. E.D.1992).[3] Such testimony is,

in effect, "no different than a confession made by an accused after proper Miranda warnings." *Id.*

■ Essential to the application of this settled principal is that the defendant's prior testimony must have been voluntarily given. *See Rodden v. State,* 795 S.W.2d 393, 396 (Mo. banc 1990) ("Testimony *voluntarily* given by a defendant in a former trial ... may be received in evidence as an admission.") (emphasis added); *Long,* 22 S.W.2d at 813 ("The test as to admissibility of such testimony is its voluntary character."). Thus, a limited exception to the general rule of admissibility exists where a defendant's testimony is effectively compelled because the testimony was given to protect one constitutional right at the expense of the Fifth Amendment privilege against self incrimination. This exception was first recognized in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

In *Simmons,* a defendant unsuccessfully sought to establish that the search of a suitcase was illegal in violation of the Fourth Amendment. *Id.* at 389, 88 S.Ct. 967. Under the circumstances presented, the defendant's testimony in a suppression hearing was essential to establish that he owned the suitcase—a prerequisite to his standing to complain about the search. *Id.* at 390–91, 88 S.Ct. 967. That testimony was later used against the defendant at trial to establish the defendant's guilt by connecting him to the incriminating evidence found in the suitcase. *Id.* at 389, 88

---

**3.** The ability to use a defendant's prior voluntary testimony in a subsequent proceeding as an admission must be distinguished, however, from the ability to compel a defendant to testify in a subsequent proceeding. *State ex rel. Imboden v. Romines,* 760 S.W.2d 130, 134 (Mo.App. E.D.1988) (holding that a witness who testifies in one proceeding may not be compelled to give further testimony in a dif-

ferent proceeding). " 'It is settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding.' " *Pelz,* 831 S.W.2d at 636 (quoting *In re Neff,* 206 F.2d 149, 152 (3rd Cir.1953)).

S.Ct. 967. Though the testimony at the suppression hearing was technically voluntary, the United States Supreme Court recognized that the testimony was "*an integral part* of [the defendant's] Fourth Amendment exclusion claim," and thus could only be given by "assuming the risk that the testimony would later be admitted against him at trial." *Id.* at 391, 88 S.Ct. 967. (Emphasis added.) Finding it "intolerable that one constitutional right should have to be surrendered in order to assert another," the Supreme Court held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 394, 88 S.Ct. 967.

In *State v. Samuels*, 965 S.W.2d 913 (Mo.App. W.D.1998), this court extended the protection of *Simmons* to a conflict between the Sixth Amendment right to counsel and the Fifth Amendment privilege against self incrimination. In *Samuels*, a defendant in a Rule 29.15 proceeding was required to testify about "details of his personal knowledge of the crime in an effort to bear the heavy burden necessary to overcome the presumption that counsel is competent." *Id.* at 918. Before the Rule 29.15 hearing was completed, the defendant was awarded a new trial based on demonstrated juror misconduct. *Id.* at 915. At the defendant's second trial, the State introduced, over the defendant's objection, the defendant's incriminating testimony from the truncated Rule 29.15 hearing to establish the defendant's guilt. *Id.* We acknowledged that the United States Supreme Court had not yet expanded the protection of the Fourth Amendment established in *Simmons* to the Sixth Amendment right to counsel. *Id.* at 917–18. However, we noted that "[t]he Second and Eighth Circuits have extended *Simmons* protection to certain statements made in the Sixth Amendment context." *Id.* at 918 (citing *United States v. Branker*, 418 F.2d 378, 381 (2nd Cir.1969) (holding that a defendant who testified to proceed *in forma pauperis* could not have that testimony used against him at trial to establish his knowing presentment of false claims, as the defendant's constitutional rights to counsel "are no less important than the constitutional rights to protection against illegal searches and seizure")); *United States v. Anderson*, 567 F.2d 839, 840–41 (8th Cir.1977) (holding that a defendant who refused to fill out *in forma pauperis* forms as a condition of demonstrating indigence in connection with tax evasion prosecution could not be forced "to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination"). In reliance on this authority, we concluded:

> [W]hen a defendant testifies at a post-conviction hearing in support of a motion alleging ineffective assistance of counsel *where the defendant's testimony is indispensable* in overcoming the heavy presumption of counsel's competence, that testimony may not be admitted against the defendant at a subsequent trial to prove its incriminating content on the ultimate issue of guilt, unless the defendant makes no objection.

*Id.* at 920. (Emphasis added.)

Williams relies heavily on *Simmons* and *Samuels* to characterize his testimony in both his first and second trials as similarly compelled by a tension between his Sixth Amendment right to counsel, his Fifth Amendment right against self-incrimination, and/or his Fourteenth Amendment due process right to present a defense. To understand Williams's argument, we must examine the procedural history of Williams's first trial and of his Rule 29.15 proceeding.

In connection with Williams's first trial, privately retained trial counsel sought State funds to hire an "expert to evaluate [Williams'] mental state ... at the time of the offense and his competency to proceed, and to advise the defense on the availability and presentation of mental defenses." *State v. Williams*, 134 S.W.3d 766, 768–69 (Mo.App. W.D.2004) (hereinafter "*Williams I*"). Trial counsel relied on the authority of *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) where the United State Supreme Court held:

> When a defendant demonstrates to the trial judge that his insanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed.

*Williams I*, 134 S.W.3d at 770. Though at the time of trial counsel's request, Williams had not entered a plea of not guilty by reason of mental disease or defect, trial counsel argued that *Ake* afforded Williams the right to confidential consultation with a mental health expert in part to assess whether a mental health defense negating criminal responsibility could or should be asserted. *Williams I*, 134 S.W.3d at 769–70.

The trial court refused to authorize an award of State funds to Williams. *Williams I*, 134 S.W.3d at 769–72. The trial court did order a section 552.020 [4] examination to determine Williams's competency to stand trial. *Id.* at 769. The trial court *did not order* a section 552.030 [5] examination relating to the defense of not guilty by reason of mental disease or defect as Williams had not expressed his intent to assert such a defense. *Id.* However, the trial court *offered* Williams a section 552.030 examination, which Williams refused. *Id.*

The section 552.020 examination and a subsequent hearing resulted in the determination that Williams was competent to stand trial. *Id.* at 770–72. Williams proceeded to trial. Williams testified that he acted in self-defense. *Id.* at 772. Williams claimed that "the shooting occurred after an argument broke out between Johnson and Quick over the price of the wheels." *Id.* "According to [Williams], he saw Clinton draw a gun as Johnson and Quick 'hollered' at each other. [Williams] claimed that, in self-defense, he reached for his own gun and shot Clinton and then fired at Quick because he was afraid that Quick, too, was armed." *Id.* Williams was convicted on October 10, 2002, and then appealed. *Id.*

We observed on appeal that a trial court is obligated to award State funds " 'to provide an indigent criminal defendant the resources to defend himself, without the need to reveal his defense strategy to the state.' " *Id.* at 773 (quoting *State v. To-*

---

4. All statutory references are to RSMo 2000 as supplemented unless otherwise noted.

5. Chapter 552 is entitled "Criminal Proceedings Involving Mental Illness" and contains provisions relating to evaluation of a defendant's capacity to stand trial (section 552.020) and the examination of a defendant who pleads or gives notice of an intent to claim a mental disease or defect negating criminal responsibility (section 552.030).

*kar*, 918 S.W.2d 753, 765 (Mo. banc 1996)).[6] However, because Williams's trial counsel failed to establish indigence in the manner contemplated by section 600.086.3 (relating to securing appointed counsel), we could not find "that the trial court erred in denying his request for state funds to employee an expert witness." *Id.* at 774 (citing *State v. Huchting*, 927 S.W.2d 411, 419 (Mo.App. E.D.1996)). Williams's conviction was thus affirmed. *Id.* at 774.

Williams then filed a Rule 29.15 motion alleging his trial counsel was ineffective for "failing to properly establish that Williams was indigent, which Williams claim[ed] was the cause of the trial court's denial of his request for funds to retain an expert witness on the issue of mental health." *Williams v. State*, 254 S.W.3d 70, 74–5 (Mo.App. W.D.2008) (hereinafter "*Williams II*"). We concluded that trial counsel's choice to elicit evidence of indigence through Williams's minimal testimony in lieu of detailed testimony or an affidavit addressing the specific subjects anticipated by section 600.086.3 and related regulation 18 C.S.R. 10–3.010.3 constituted ineffective assistance of counsel. *Id.* at 76–7. With respect to prejudice, we concluded that Chapter 552 procedures are not sufficient to afford a defendant the rights recognized in *Ake*. *Id.* at 81. Because Williams had raised at trial (based on evidence of prior mental health episodes) "a serious question ... as to his *sanity at the time of the offenses* for which he was convicted," we concluded that "Williams' *ability to evaluate and assert the defense of insanity was crippled* by his lack of access to a psychiatrist for those purposes." *Id.* at 82. (Emphasis added.) We held, therefore, that:

Williams was denied the opportunity for a fair trial *with respect to the issue of his sanity and its effect on his responsibility for the crimes with which he was charged* .... there does exist a reasonable probability that the outcome of trial would have been different had Williams been able to avail himself of his due process entitlement to the assistance of a psychiatric expert, such that confidence in the accuracy of the outcome is substantially undermined.

*Id.* (Emphasis added.) We reversed Williams's conviction, and remanded the case for a new trial. *Id.* at 83.

Of significant import, we did not conclude in *Williams II* that *Ake* afforded Williams the right (if indigent) to State funds to hire an independent expert to determine his competence to stand trial, consistent with *Ake*'s pronouncement that an indigent defendant is entitled to access to an independent psychiatrist to assist in "evaluation, preparation, and presentation of the defense" of insanity "[w]hen a defendant demonstrates to the trial judge *that his insanity at the time of the offense* is to be a significant factor at trial." *Ake*, 470 U.S. at 83, 105 S.Ct. 1087. (Emphasis added.) As we have noted, the section 552.020 examination ordered by the trial court in Williams's first trial determined that Williams was competent to stand trial, a conclusion that was not implicated by our holding in *Williams II*.

■ With this backdrop, we return to discussion of Williams's efforts to analogize his circumstances to those in *Simmons* and *Samuels*. Williams's efforts can be summarized as follows: (1) because Williams was deprived of the possible de-

---

**6.** In *Tokar*, our Supreme Court declined the opportunity to determine whether *Ake* applied only to circumstances where a defendant "claims insanity at the time of the criminal offense is to be a significant factor," *Ake*, 470 U.S. at 83, 105 S.Ct. 1087, or as well to a defendant's claim of incompetency to stand trial. *Tokar*, 918 S.W.2d at 765.

fense of not guilty by reason of mental disease or defect in his first trial due to ineffective assistance of counsel, he was "forced" to testify (lacking a mental health defense) that he acted in self-defense; and (2) because Williams's testimony that he acted in self-defense in the first trial was effectively compelled as a result of the denial of his Sixth Amendment right to effective counsel, the testimony was not a voluntary waiver of his Fifth Amendment privilege against self incrimination, but was instead a result of tension between competing constitutional rights; and (3) once the "compelled" testimony from the first trial was erroneously admitted in the second trial as a part of the State's case-in chief, Williams was once again compelled in violation of his Fifth Amendment rights to take the stand during his case-in-chief to reiterate that he acted in self-defense.[7] In Williams's words, the effect of admission in Williams's second trial of Williams's testimony from his first trial was to hit the replay button, depriving Williams of a fair trial untainted in any manner by the ineffective assistance of counsel he received in the first trial.

Williams's argument is flawed on several levels. First, the critical tension between constitutional rights at play in *Simmons* and *Samuels* is simply not present here. Both *Simmons* and *Samuels* involved a defendant's "integral" or "indispensible" testimony in a hearing to establish or protect either a Fourth or Sixth Amendment right. *Simmons*, 390 U.S. at 391, 88 S.Ct. 967; *Samuels*, 965 S.W.2d at 920. Both *Simmons* and *Samuels* involved the subse-

quent use, over the defendant's objection, of the defendant's "effectively compelled" testimony at trial on the issue of guilt. *Simmons*, 390 U.S. at 389, 88 S.Ct. 967; *Samuels*, 965 S.W.2d at 915. Both *Simmons* and *Samuels* thus involved a claim that the admission of the defendant's prior testimony in the defendant's subsequent trial violated the defendant's Fifth Amendment privilege against self incrimination.

In stark contrast, the testimony Williams gave in his first trial was given *after* his Sixth Amendment right to effective counsel was violated—and not to protect or enforce that right. Instead, Williams's testimony was given in the first trial to establish a legal defense to criminal responsibility. Though Williams creatively suggests that because a violation of his Sixth Amendment right to effective assistance of counsel deprived him of the defense of not guilty by reason of insanity and "forced" him to waive his Fifth Amendment right to assert self-defense, such a scenario (even if believed) is not indicative of testimony compelled due to a "tension" between constitutional rights. In fact, Williams's Sixth Amendment right to effective assistance of counsel would have been protected just as effectively by his silence during the first trial. Thus, Williams's testimony was neither "integral" nor "indispensible" to the protection of his Sixth Amendment right to effective assistance counsel. As a result, we cannot conclude that Williams's testimony during his first trial was "effectively compelled" in violation of his Fifth Amendment privilege against self incrimination.[8]

7. Williams's counsel admitted during oral argument that Williams's testimony in his second trial was materially indistinguishable from his testimony in the first trial.

8. There can be circumstances where in the absence of tension between competing constitutional rights, a defendant's decision to testi-

fy at trial might later be determined in a post-conviction proceeding to have been involuntary as in the possible case, for example, where counsel provides ineffective assistance by affirmatively misrepresenting that the defendant would not be subject to cross-examination about prior convictions. Obviously, a determination that a defendant's waiver of his

■ Second, we cannot fathom how Williams's self-defense testimony in his first trial can be viewed as compelled by deprivation of the defense of a mental disease or defect negating criminal responsibility. There is no Fourteenth Amendment due process which requires a defendant to have at his disposal an absolute defense negating criminal responsibility. Thus, if we presume Williams's self-defense testimony was truthfully asserted, we must conclude that the testimony could only have assisted Williams as it was of an exculpatory nature. However, if the real basis for Williams's complaint is, as Williams *seems* to be suggesting, that Williams felt compelled to "manufacture" the defense of self-defense because the defense of mental disease or defect was not available to him, then his testimony was not compelled by "tension" between competing constitutional rights, but instead by a desire to negate criminal responsibility at the expense of the truth. We are aware of no constitutional right to suborn perjury.

Third, Williams's claim that his self-defense testimony was compelled during his first trial necessarily presumes that but for the ineffective assistance of counsel, a confidential mental health evaluation would have established that Williams suffered from a mental disease or defect at the time of his offense. This presumption collides, however, with a glaring omission in the record. Williams has never established that he would have been able to assert the defense of mental disease or defect at the time of his offense. In fact, at a pre-trial hearing in connection with

the second trial Williams's defense counsel stated:

> I will not be presenting any evidence regarding Mr. Williams' mental health. He has been examined by a psychiatrist. It was a number of years after [trial counsel in the first trial] was making the request. The information from that psychiatrist, I can't find anything in there that would benefit him as far as his legal responsibility for his actions. I didn't see anything regarding an NGRI [not guilty by reason of insanity], nothing that spoke to his competency at the time that examination was done and nothing of any real value as far as mitigation in the event we get to sentencing. To fully avail ourselves of it, my dealings with Mr. Williams does [sic] not show that he now has any sort of mental health problems beyond that which we all have and I think we're agreed that that's not the direction that we're going to go in this and it's not for want of funds at this point to do the evaluation. It has been done. It's just that by the time it was done there wasn't anything helpful there.

Following this announcement, the trial court inquired of Williams's counsel to confirm that Williams had no intention to present mental health testimony during the guilt or sentencing phase. To further make a record on the subject, Williams testified that he had "discussed [with trial counsel] possible mental health defenses that might be available to a defendant in this type of case," and that Williams was "in agreement with [trial counsel] to proceed without presenting a mental health

Fifth Amendment privilege was not knowing or voluntary would independently prevent use of the defendant's involuntary testimony at a later trial. Such a scenario presents a routine inquiry into the knowing and voluntary waiver of the right to remain silent, however;

Williams does not make such a voluntariness argument, but instead claims that his voluntary testimony was "effectively compelled" by the desire to protect a competing constitutional right.

defense." In fact, Williams specifically testified "I'm competent to proceed without the mental health defense."

It is evident therefore that the right denied Williams in his first trial was merely theoretical. When afforded an independent psychiatric examination, it revealed that Williams had no basis to assert the defense of mental disease or defect at the time of his offense negating criminal responsibility.[9] Thus, Williams has no basis to claim on appeal that his self-defense testimony in the first trial was compelled when, notwithstanding ineffective assistance of counsel, a mental health defense would not have been available to Williams in his first trial.

Fourth, though Williams hints at this issue in his brief, there is no evidence to suggest that Williams was not competent during his first trial as to call into question the voluntariness of his decision to testify. The section 552.020 report ordered by the trial court in the first trial concluded that Williams was competent to stand trial. *Williams I,* 134 S.W.3d at 770. Following a hearing, the trial court concluded that Williams was competent to stand trial. *Id.* at 771–72. Our decision in *Williams II* was limited to the prejudice Williams sustained in being deprived of the ability to determine whether he suffered a mental disease or defect **at the time of his offense,** and did not in any way implicate the trial court's conclusion that Williams was competent to stand trial. *Williams II* at 82–3.

Fifth, though Williams unsuccessfully objected to the admission of the testimony from his first trial during his second trial, Williams thereafter took the stand to repeat, via live testimony, his claim of self-defense. A thorough record of the voluntary nature of that decision was made.

Q: (by Williams' trial counsel) And you understand that, again, whether or not you testify is completely your choice?

A: (by Williams) I understand.

Q: And has anyone forced you to testify?

A: No.

Q: Is your decision to testify your free and voluntary act?

A: Yes it is.

After discussion between the trial judge and Williams to assure that Williams's decision to testify was voluntary, Williams was permitted to speak privately with trial counsel. Before that discussion occurred, and as a matter of housekeeping, counsel for the State and for Williams discussed jury instructions, and specifically, the self-defense and defense of others instructions Williams would be tendering. Then, after private consultation with trial counsel, Williams again took the stand and testified as follows:

Q: (by the trial court) After having talked with [trial counsel], have you decided to testify or not testify?

A: I've decided to testify.

. . .

9. The record reflects that Williams's post-conviction counsel apparently had Williams examined by a psychiatrist in advance of Williams's Rule 29.15 hearing, and thus in advance of our decision in *Williams II.* Because of the overlay of the indigence issue, we rejected in that case the State's argument that without evidence that a psychiatric examination would have established that Williams had a defense of mental disease or defect, Williams could not establish prejudice. *Williams II* at 82–3. We offer no comment on post-conviction counsel's ethical obligation to disclose evidence apparently in her possession that would have demonstrated that the relief sought by Williams in his Rule 29.15 hearing and in *Williams II* was hypothetical and illusory.

Q: Is [trial counsel] forcing you to testify against your will?

A: No, he is not.

. . .

Q: *Has anyone forced you* or intimidated you or threatened you in any way, thereby forcing you *to testify in this case?*

A: *No sir.*

(Emphasis added.) Williams's unequivocal testimony negates his claim on appeal that he was compelled to testify in his second trial because of the admission of his testimony from the first trial. Moreover, the absence of any record that Williams felt forced to testify to promote a defense he would not otherwise have asserted is notably highlighted by the fact that the subject of the self-defense instructions came up during the waiver litany. Thus, even if the framework of constitutional tension addressed in *Simmons* and *Samuels* could be maneuvered to apply to Williams's testimony in his second trial, both cases make it clear that the prohibition against admission of "effectively compelled" testimony exists "unless the defendant makes no objection." *Simmons*, 390 U.S. at 394, 88 S.Ct. 967; *Samuels*, 965 S.W.2d at 920. Williams made no objection (or record) that his testimony in his second trial was compelled. Williams has neither preserved review of, nor demonstrated any merit to, his complaint that his testimony in the second trial was compelled in violation of his Fifth Amendment privilege against self incrimination.

■ Finally, in Williams's motion for new trial, his claim of error relating to the subject of admission of his testimony from the first trial began as follows:

Said statement was made without a knowing and intelligent waiver of [Williams'] privilege against self-incrimination and there was no indication in the previous record that [Williams] was even advised of his privilege against self-incrimination and his right not to testify in the record of the prior trial.

This claim of error addresses the apparent absence of reference in the transcript from the first trial to any inquiry of Williams establishing a voluntary waiver of his Fifth Amendment rights. The claim does not affirmatively suggest or argue that Williams was "compelled" to testify in his first trial because he had been deprived of an ability to assert the defense of mental disease or defect. The motion for new trial continues:

While defendant was represented by counsel at his prior trial, it should be noted that the basis of the remand from the Court of Appeals was a Missouri Supreme Court Rule 29.15 motion alleging ineffective assistance of that counsel *on the issue of testimony elicited by that counsel from [Williams] in a facet of the previous trial.* The *admission of this evidence* over [Williams'] objection *forced [Williams] to waive his privilege against self-incrimination in this trial in order to correct errors in the previous testimony.*

Though this claim of error comes close to Williams's claim on appeal, in fact the claims of error are materially divergent. The testimony mentioned in the motion for new trial which was the subject of the Rule 29.15 motion was *not* the testimony that Williams acted in self defense, but was instead Williams's pre-trial testimony on the issue of his indigence. That testimony was not admitted, of course, in the second trial, and thus had no bearing on Williams's decision to testify in the second trial. The motion for new trial never asserts, therefore, that Williams's decision to testify in the second trial was forced by the admission of his self-defense testimony in the first trial. Even if we treat the assertion in the motion for new trial as

addressing the self-defense testimony from the first trial, Williams concedes on appeal that his self-defense testimony in both cases was materially indistinguishable. Thus, Williams's testimony in his second trial was not "forced" to address errors in his previous testimony. "Allegations of error in a motion for new trial may not be changed or broadened on appeal." *State v. Johnson,* 358 S.W.3d 574 (Mo.App. S.D. 2012).

It is thus highly suspect whether Williams has adequately preserved for our review the serious constitutional challenges he now raises on appeal. "In jury-tried criminal cases, with exceptions inapplicable here, 'allegations of error to be preserved for appellate review must be included' in a motion for new trial." *Id.* (citing Rule 29.11(d)). And, as Williams has not demonstrated that his testimony in either the first or second trial was involuntarily compelled, we cannot conclude that the trial court committed evident, obvious, and clear error affecting substantial rights warranting plain error review of the trial court's admission of Williams's testimony from the first trial. *State v. Wilkerson,* 330 S.W.3d 851, 854 (Mo.App. W.D.2011) (discussing the standard for plain error review).

Williams has not demonstrated that his testimony in either his first or second trials was involuntary or effectively compelled, rendering the testimony in his first trial admissible in his second trial. *Rodden,* 795 S.W.2d at 396; *Pelz,* 831 S.W.2d at 636. The trial court did not abuse its discretion in admitting Williams's testimony from his first trial.

Point one is denied.

## Point II

In his second point, Williams claims the trial court erroneously permitted the State, over Williams's objections, to reference Williams's participation in a robbery when Williams was not charged with robbery. Williams complains the references were highly prejudicial as they were presented "solely to show that [Williams] had a propensity to commit other bad acts." We disagree.

Williams complains about the following statements and evidence made or received over Williams's objections:

(1) The State commented in its opening statement that "the evidence will show that [Williams] knew his buddy Kevin Johnson was planning to take those wheels without paying for them, at least without paying full price for them."

(2) The State cross-examined Williams by asking "sir, the only price that was paid for those wheels was Rusty Clinton's life and that was a price you were willing to pay, wasn't it?"

(3) The State argued during its closing that "folks, I was just getting ready to tell you what you know to be the motive for this murder. You know that Kevin Johnson wanted to get out of that apartment with those wheels without paying and you know [Williams] knew that and then [Williams] figures he knows how to get away with those wheels without paying."

Williams argues that in each case, the State improperly commented on Williams's participation in a robbery, a crime with which he was not charged. Williams also points out that he was not charged with felony murder, and that discussion of a robbery cannot be rationalized on that basis.

"A defendant has the right to be tried only on the offense for which he is charged." *State v. Davis,* 226 S.W.3d 167, 170 (Mo.App. W.D.2007) (citing *State v. Barriner,* 34 S.W.3d 139, 144 (Mo. banc 2000)). Hence, evidence of uncharged

"separate and distinct crimes" cannot be used to demonstrate the defendant's propensity to commit the charged crime. *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008). "However, evidence of the defendant's prior misconduct is admissible when it is logically relevant—it has some legitimate tendency to directly establish the accused's guilt of the charges for which he is on trial, and when it is legally relevant—its probative value outweighs its prejudicial effect." *State v. Uptegrove*, 330 S.W.3d 586, 593 (Mo.App. W.D.2011). Evidence of uncharged crimes is logically relevant if it is probative of motive, intent, the absence of mistake or accident, identity, or a common plan or scheme. *Vorhees*, at 588; *State v. Slaughter*, 316 S.W.3d 400, 403 (Mo.App. W.D.2010). "An additional well-recognized exception exists 'for the admission of evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged.'" *Id.* at 403–04 (citation omitted).

At trial, the State defended its comment during opening statement on the basis that the evidence discussed was relevant to demonstrate Williams's motive to shoot Clinton as Williams knew of Johnson's intentions. The State also defended its cross-examination of Williams and its argument during closing on the basis that the evidence discussed established motive.

■ "In Missouri, evidence of motive is logically relevant and admissible." *State v. Pickens*, 332 S.W.3d 303, 315 n. 9 (Mo. App. E.D.2011) (citing *State v. Shurn*, 866 S.W.2d 447, 457 (Mo. banc 1993)). This is so even where, as here, motive is not an element of the crime with which a defendant is charged. *Id.* Here, an explanation for Williams's act of shooting Clinton and shooting at Quick (and thus his motive) was his knowledge of Johnson's intent to steal the wheels from Quick. Evidence of

Williams's motive was all the more relevant given Williams's claim that he shot Clinton and shot at Quick in self-defense. *Id.* (noting that "[t]he State and the accused alike generally have wide latitude to develop evidence of motive").

■ Evidence of Williams's knowledge of Johnson's objective to steal the wheels from Quick was also relevant to demonstrate "the circumstances or the sequence of events surrounding the offense charged." *Slaughter*, 316 S.W.3d at 403–04. "Generally, acts, statements, occurrences and the circumstances forming part of the main transaction may be shown in evidence under the *res gestae* rule where they precede the offense immediately or by a short interval of time and tend, as background information, to elucidate a main fact in issue." *Davis*, 226 S.W.3d at 170–71. Here, an explanation for Williams's conduct was obviously at issue. Williams claimed he acted in self-defense. Without an explanation of all of the circumstances, which included Williams's knowledge of Johnson's intentions, the jury would have been deprived of "a complete and coherent picture of the criminal events that transpired." *Id.* at 170. *See State v. Henderson*, 301 S.W.2d 813, 816–17 (Mo.1957) ("[T]he presence or absence of motive is an evidentiary circumstance to be given such weight by the jury as they consider it entitled to under all the circumstances.").

We further observe that notwithstanding Williams's preserved objections to the three statements or evidence raised in this appeal, other similar evidence was admitted at trial without an objection, or over an objection which has been abandoned as a claim of error on appeal. For example, in Williams's testimony in both his first and second trials, Williams acknowledged that Johnson told him while on the way to Quick's apartment that he intended to "get

over" on Quick. Williams testified that this meant Johnson intended to steal the wheels or to at least pay less than full price for them. In response, Williams testified that he nodded his head. He also removed a gun from its hiding place in his vehicle and placed it up his sleeve. The evidence also demonstrated that armed with knowledge of Johnson's intent and with a gun, Williams continued driving his car to Quick's apartment, helped load the two tires from Quick and the three wheels from Clinton, and (apparently) assisted in grabbing the fourth wheel as Williams and Johnson fled Quick's apartment.[10] The jury also heard that when Johnson and Williams were in custody, Williams told Johnson to say that Clinton had a gun out before Williams shot him, suggesting that Williams was already contemplating the assertion of self-defense.

The jury could have drawn a reasonable inference from this uncontested evidence that after Johnson twice left the apartment for "more money," after Johnson unsuccessfully attempted to explain the need for Williams to come out to the car with him, and after Johnson and Quick began haggling over money, Williams decided to take matters into his own hands. The uncontested evidence[11] thus negates any prejudice that might otherwise have attached to the statements and evidence about which Williams complains on appeal. "[I]n matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Naasz*, 142 S.W.3d 869, 878 (Mo.App.S.D. 2004).

We conclude that the trial court did not abuse its discretion in permitting the State to comment and offer evidence about Williams's knowledge of Johnson's intent to steal from Quick. The statements and evidence were logically relevant to the issue of Williams's motive, and assisted in explaining the sequence of events that led to Williams's shooting of Clinton and assault of Quick. The statements and evidence were also logically relevant to negate Williams's characterization of his actions as self-defense. The statements and evidence were legally relevant as their probative value outweighed any prejudicial effect, particularly as similar evidence was admitted without objection or claim of error.

Point two is denied.

### Conclusion

The trial court's judgment is affirmed.

All concur.

---

10. Though only three wheels had been loaded into Williams's car before the shooting, all four wheels were later recovered at Johnson's grandmother's house.

11. Williams did object, generally, to the admission of this testimony from his first trial claiming it to be involuntary, a contention we have already discussed and rejected.